IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

RON and LAUREN PARRISH, as Parents of L;
VICTOR and LAURA CRAIG, as Parents of A;
CASEY and CHASTIDY LAWS, as Parents of G;
and RACHELLE SIVERLY, as Parent of S                                            PLAINTIFFS

v.                                         No. 5:15-CV-05083

BENTONVILLE SCHOOL DISTRICT;
ARKANSAS DEPARTMENT OF EDUCATION; and
JOHNNY KEY, Commissioner                                                     DEFENDANTS

## OPINION AND ORDER

Before the Court are the following motions to be resolved:

- Bentonville School District filed a motion for summary judgment on all claims asserted by the Parrish Plaintiffs (Doc. 136), a brief in support of its motion (Doc. 138), and a statement of facts in support of its motion (Doc. 137). Plaintiffs submitted a response in opposition to summary judgment (Doc. 161), a brief in support of their response (Doc. 162), a statement of facts to which they contend there is a dispute of material fact (Doc. 163), and a supplement to their response in opposition (Doc. 169). Bentonville School District filed a reply to the Parrishes' opposition (Doc. 180).

- Bentonville School District filed a motion for summary judgment on all claims asserted by the Craig Plaintiffs (Doc. 143), a brief in support of its motion (Doc. 144), and a statement of facts in support of its motion (Doc. 145). Plaintiffs submitted a response in opposition to summary judgment (Doc. 161), a brief in support of their response (Doc. 162), a statement of facts to which they contend there is a dispute of material fact (Doc. 163), and a supplement to their response in opposition (Doc. 169). Bentonville School District filed a reply to the Craigs' opposition (Doc. 182).

1

- Bentonville School District filed a motion for summary judgment on all claims asserted by the Siverly Plaintiff (Doc. 128), a brief in support of its motion (Doc. 129), and a statement of facts in support of its motion (Doc. 130). Plaintiff submitted a response in opposition to summary judgment (Doc. 164), a brief in support of her response (Doc. 165), a statement of facts to which she contends there is a dispute of material fact (Doc. 166), and a supplement to her response in opposition (Doc. 170). Bentonville School District filed a reply to Ms. Siverly's opposition (Doc. 181).

- Bentonville School District filed a motion for summary judgment on all claims asserted by the Laws Plaintiffs (Doc. 132), a brief in support of its motion (Doc. 134), and a statement of facts in support of its motion (Doc. 133). Plaintiffs submitted a response in opposition to summary judgment (Doc. 164), a brief in support of their response (Doc. 165), a statement of facts to which they contend there is a dispute of material fact (Doc. 166), and a supplement to their response in opposition (Doc. 170). Bentonville School District filed a reply to the Laws' opposition (Doc. 179).

- Defendants Arkansas Department of Education and Commissioner Johnny Key filed a motion for summary judgment (Doc. 125), a brief in support of their motion (Doc. 126), and a statement of facts in support of their motion (Doc. 127). Plaintiffs submitted a response in opposition to summary judgment (Doc. 172), a brief in support of their opposition (Doc. 173), and a statement of facts that they contend are in dispute (Doc. 167). Defendants Arkansas Department of Education and Commissioner Key filed a reply to the Plaintiffs' opposition. (Doc. 176).

- The Parrish and Craig Plaintiffs filed a motion for summary judgment against the Arkansas Department of Education (Doc. 139), a statement of facts in support of their motion

2

(Doc. 140), a brief in support of their motion (Doc. 141), and two supplemental filings (Docs. 142, 148).  The Arkansas Department of Education submitted a response in opposition to the Plaintiffs' motion (Doc. 155), and a response to Plaintiffs statement of facts and supplements (Doc. 156).  Plaintiffs filed a reply to the Arkansas Department of Education's opposition to their motion for summary judgment.  (Doc. 174).

- Bentonville School District filed a motion to sever the case.  (Doc. 77).  Plaintiffs filed a response in opposition to the motion (Doc. 83) as well as a memorandum brief in support of their response in opposition.  (Doc. 84).  The Court previously took this motion under advisement and directed the parties to submit a succinct joint proposal of severance, or if no agreement could be reached, separate succinct proposals by Monday May 9, 2016. (Doc. 91, p. 16).  Defendants Bentonville School District and the Arkansas Department of Education filed a joint severance proposal on May 9, 2016.  (Doc. 99).  Plaintiffs did not file anything in accordance with the Court's order.

For the following reasons, Bentonville School District's motions for summary judgment (Docs. 128, 132, 136, 143) will be GRANTED, the Arkansas Department of Education's motion for summary judgment (Doc. 125) will be GRANTED,  Plaintiffs' motion for summary judgment on claims against the Arkansas Department of Education (Doc. 139) will be DENIED, and Bentonville School District's motion to sever the case (Doc. 77) will be TERMINATED AS MOOT.

## I.    Background

The Parrishes, the Craigs, Ms. Siverly, and the Lawses all had children that attended the Bentonville School District (BSD) for various lengths of time, and out of these interactions with BSD arose the instant lawsuit.  Additionally, the Parrishes and the Craigs exhausted administrative

due process hearings with the Arkansas Department of Education (ADE) and as such have also asserted claims against the ADE and Commissioner Johnny Key.  The Court has reviewed all of the filings on the docket as well as the administrative records of the Craig and Parrish Plaintiffs.

The Parrishes' son, L, is an autistic student who attended BSD from kindergarten until the middle of his third grade year on March 14, 2013.  L was significantly behind grade level academically, and during his third grade year L's misbehavior become more frequent and severe.  His misbehavior included striking other students and staff members, including punching one teacher in the eye and also striking a pregnant teacher.  L's misbehavior included many outbursts and acts of physical aggression.  In the course of preventing physical harm to themselves and others, BSD employees touched[1] L, which led to the Parrishes' claims that BSD used inappropriate force in restraining L.

The Craigs' son, A, is an autistic student who attended BSD from kindergarten until the end of his second grade year.  A was mostly at or above grade level academically, but his behavior was largely disruptive and destructive.  There was a period in the fall of his second grade year where A's behavior was under control.  However, in the spring of his second grade year his behavior problems returned and his parents voluntarily withdrew him from school at the end of the year.  A's misconduct included a long list of destructive behaviors such as striking others, destroying property, and causing an imminent threat to himself and others.  In the course of preventing physical harm to themselves and others, BSD employees touched A, which led to the Craigs' claims that BSD used inappropriate force in restraining A.

---

[1] BSD is very careful in its briefing to avoid saying that it restrained the students involved in this case.  The Plaintiffs repeatedly refer to the physical contact as restraint.  The various forms of physical contact will be chronicled at great length throughout this opinion, but here the Court merely means to indicate that there was indeed physical contact.

Ms. Siverly's son, S, is an autistic student who attended BSD during his second grade year. S's behavior was physically aggressive, and included throwing objects at others, kicking, and punching. S's student crisis plan explicitly authorized BSD to use physical restraint as a last resort when S presented a danger to himself and others. In addressing S's misbehavior and acts of physical aggression, BSD restrained S and placed S in a de-escalation room.

The Laws' son, G, an autistic student who attended BSD during his second grade year. In educating G, BSD did not use methods of behavior management involving physical restraint and seclusion.

The Craig and Parrish Plaintiffs seek review of final administrative orders that followed due process hearings conducted by the ADE. The hearings were held at the request of Plaintiffs, who alleged that their disabled children had been denied a Free Appropriate Public Education (FAPE) by BSD, contrary to the requirements of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.* Defendant BSD is a political subdivision organized and existing under the laws of the State of Arkansas. BSD is subject to the IDEA's requirements because it is a public school system receiving federal funds for its educational programming. Accordingly, BSD is mandated by federal law to provide a FAPE to all children with disabilities residing within its educational boundaries. *Id.*

In accordance with the provisions of the IDEA, BSD developed Individualized Educational Programs (IEP) for each student each year that the child was enrolled at BSD. To create an IEP for a disabled student, the district assembled a team of educators, specialists, and the child's parents to plan a course of study that would educate the child while taking into account the child's particular disability. An IEP contains, among other things, information about the child's present level of academic achievement and functional performance, including measurable annual goals

and short term objectives, a description of the specific educational services to be provided to the child, and the extent to which the child will be educated in regular education programs. 20 U.S.C. § 1414(d). In addition, Congress requires that educational services be provided to a child with disabilities, to the maximum extent appropriate, in the regular educational environment, and that no child with a disability be removed to special classes or separate schools unless the child cannot be educated satisfactorily in the regular education environment. 20 U.S.C. § 1412(a)(5); *W.K. v. Harrison Sch. Dist.*, 2012 WL 2681592, at *1 (W.D. Ark. July 6, 2012), *aff'd,* 509 F. App'x 565 (8th Cir. 2013). In seeking review of these administrative proceedings, the Parrishes and Craigs not only allege that BSD denied their children a FAPE under the IDEA, but also that the ADE violated the IDEA in conducting the underlying hearings.

This lawsuit also involves all four plaintiffs bringing claims under 42 U.S.C. § 1983 based on the right to bodily integrity, equal protection claims also brought under § 1983, § 504 of the Rehabilitation Act claims, and claims under Title II of the Americans with Disabilities Act against BSD, the ADE, and Commissioner Key. This lawsuit previously involved many other defendants in their individual capacities, as well as multiple state tort claims, but those additional defendants and claims have been dismissed.

## II.    Legal Standard

### A.    Summary Judgment

When a party moves for summary judgment, it must establish both the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such

that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66–67 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Only facts "that might affect the outcome of the suit under the governing law" need be considered.  *Anderson*, 477 U.S. at 248.  "[T]he non-movant must make a sufficient showing on every essential element of its claim on which it bears the burden of proof."  *P.H. v. Sch. Dist. of Kan. City, Mo.*, 265 F.3d 653, 658 (8th Cir. 2001) (quotation omitted).  Facts asserted by the nonmoving party "must be properly supported by the record," in which case those "facts and the inferences to be drawn from them [are viewed] in the light most favorable to the nonmoving party."  *Id*. at 656–57.

## B.    District Court in Review of State Administrative IDEA Proceedings

The IDEA requires every local educational agency (LEA) receiving federal funds to implement policies "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE] by such agenc[y]."  *B.S. ex rel. K.S. v. Anoka Hennepin Public Schs.*, 799 F.3d 1217, 1219 (8th Cir. 2015) (quoting 20 U.S.C. § 1415(a)).   A party challenging whether an LEA provided FAPE has the right to file an administrative complaint and receive an impartial due process hearing before a local or state agency.  20 U.S.C. § 1415(b)(6).  The IDEA also allows for a party to seek a review of the local or state due-process hearing in a federal district court.  20 U.S.C. § 1415(i)(2)(A) and (3)(A).  In reviewing a hearing officer's decision, the IDEA provides that the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415.

In handling such a review, a district court serves a quasi-appellate function while remaining a court of original jurisdiction.  *See Kirkpatrick v. Lenoir Cnty Bd. of Educ.*, 216 F.3d 380, 387 (4th Cir. 2000) ("[W]hile a federal district court may review a state review officer's decision and even defer to that decision, the federal district court does not sit as an appellate court.  Federal district courts are courts of limited, original jurisdiction with no power to sit as appellate tribunals over state court or administrative proceedings."); *Spiegler v. D.C.*, 866 F.2d 461, 465-66 (D.C. Cir. 1989) (holding that the quasi-appellate role of the district court in an action brought under the [IDEA] does not differ in important ways from an administrative appeal for purposes of borrowing an appropriate statute of limitations); *Adler by Adler v. Educ. Dep't of State of N.Y.*, 760 F.2d 454, 458-59 (2d Cir. 1985) (same). The Eighth Circuit has explained the nature of a district court's function in handling an IDEA claim as:

> The district court must . . . review the administrative record, hear additional evidence if requested, and "basing its decision on the preponderance of the evidence, . . . grant such relief as [it] determines is appropriate." *Id.* at § 1415(i)(2)(C). In deciding whether the IDEA has been violated, the district court must "independently determine whether the child [in question] has received a FAPE." *CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 636 (8th Cir. 2003), *cert. denied*, 540 U.S. 984, 124 S. Ct. 478, 157 L. Ed. 2d 375 (2003). In doing so, the court must also give "'due weight' to agency decision-making." *Id.* (*quoting Independent Sch. Dist. No. 283 v. S.D. ex rel. J.D.*, 88 F.3d 556, 561 (8th Cir. 1996)). This somewhat "unusual" standard of review is less deferential than the substantial evidence standard commonly applied in federal administrative law. *Dist. No. 283*, 88 F.3d at 561. But we have recognized that this limited grant of deference—"due weight"—is appropriate in IDEA cases because the ALJ "had an opportunity to observe the demeanor of the witnesses and because a [district] court should not substitute its own notions of sound educational policy for those of the school authorities that [it] review[s]." *CJN*, 323 F.3d at 636 (internal quotation marks and citation omitted).

*K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 803 (8th Cir. 2011).

"A prevailing party at the administrative level is entitled to an award of its attorneys' fees." *Swearingen v. Ozark Mountain Sch. Dist.*, No. 3:16-CV-03029, 2016 WL 7155773, at *6 (W.D.

Ark. Dec. 7, 2016).  A party has prevailed "if it succeeded on any significant issue which achieved some of the benefit it sought."  *Yankton School District v. Schramm*, 93 F.3d 1369, 1377 (8th Cir. 1996).  "The IDEA's attorney's fees provision, 20 U.S.C. § 1415(e)(4)(B) (1986), is similar to the civil rights attorney's fees award statute, 42 U.S.C. § 1988 (1986).  Under both statutes, attorney's fees should ordinarily be awarded to the prevailing party unless 'special circumstances' exist to make an award unjust."  *Borengasser v. Ark. State Bd. of Educ.*, 996 F.2d 196, 199 (8th Cir. 1993).

## III.    Discussion

### A.    BSD's Motion for Summary Judgment on All Claims Asserted by the Parrish Plaintiffs.  (Doc. 136).

#### 1.    IDEA Claim

In reviewing BSD's motion for summary judgment on the Parrishes' IDEA claim, the Court will follow the law as set out in Section II.B above, and a motion for summary judgment is not defeated by merely showing a genuine dispute of material fact.  Instead such a showing triggers a more thorough review of the record.  *See* 3 Ams. with Disabilities: Practice & Compliance Manual § 11:314 (2016).  The Court has examined the parties' briefs, reviewed the entire administrative record, carefully read the Hearing Officer's written opinion, and looked at the relevant case law.  *See Swearingen v. Ozark Mtn. Sch. Dist.*, 2016 WL 7155773 (W.D. Ark. 2016).  For the reasons set forth below, the Court affirms the Hearing Officer's decision in favor of BSD.  Therefore, BSD's motion for summary judgment is granted.  (Doc. 136).

#### a.    Background

When L was two years old, his mother noticed that he was not making progress and was exhibiting behaviors indicating that assistance may be needed.  (Hearing Officer's Final Decision and Order, p. 4).  At age four, L began receiving speech and occupational therapy, and he was diagnosed with autism when he was in kindergarten at BSD.  (*Id.*).  In the 2012-2013 school year,

L was enrolled in the third grade at Elm Tree Elementary School in the BSD. (*Id.*). During this school year, L received services pursuant to the IDEA due to his diagnosis of autism. At the beginning of the school year BSD provided services to L under his existing IEP dated March 30, 2012. That IEP was current through March 30, 2013, at which time BSD would be obligated to revisit it in an annual meeting. (*Id.*).

Pursuant to that existing IEP, L was to receive 900 minutes of general education and 1,200 minutes of special education per week. (Parent's Exhibits, p. 82).[2] That IEP also provided for L to receive occupational therapy one time per week and speech therapy two times per week. (*Id.*). Further, the IEP provided an assessment of L's academic progress, in which it was documented that he was performing below grade level. (*Id.*). Specifically, the results of L's most recent STAR tests revealed that he was reading at a 0.5 grade level and performing math at a 1.4 grade level. (*Id.*). The IEP went on to outline goals for L over the next year, and describe the various instructional modifications, supplemental aids, and supports that BSD would provide to L. (*Id.*). The IEP provided minimal guidance on how BSD was to manage L's behavior, but that was because prior to L's third grade year behavior had not been an issue at school. (Hearing Officer's Final Decision and Order, pp. 6-7). In compliance with the IDEA, L's mother was present at the March 30, 2012 meeting, and signed the IEP. (*Id.*).

During L's third grade year his behavior in school took a drastic turn for the worse. (*Id.*, p. 7; 2014-11-11 Hearing Transcript, p. 117). BSD held a programming conference at the Parrishes' request on September 4, 2012, and began to create a behavioral plan for L. (Hearing Officer's Final Decision and Order, pp. 6-7). The behavior plan identified six specific methods

---

[2] All citations to the administrative records, which were submitted electronically, use the file name assigned to each file by the parties. Any grammatical errors or unconventional citations are adopted not for their correctness but rather to facilitate easier location of the sources.

that BSD would use to address L's misbehavior, and at the programming conference it was decided that more comprehensive steps would be taken by BSD such as conducting a functional behavior assessment (FBA), and making behavioral observations.  (*Id.*, pp. 7-8).  L's mother was present at this meeting.  (*Id.*, p. 7).

On October 3, 2012, another programming conference was held to review the behavior plan that had been developed for L.  (*Id.*, p. 8).  The record includes the FBA as well as a behavioral support plan, both dated October 3, 2012.  (TAB 1P - IEP - 10-03-2012, p. 4).  The FBA outlines L's specific recurring misbehaviors.  First, L exhibited a variety of attention seeking behaviors in the general education setting that stemmed in part from disagreements with another student.  (*Id.*).  Second, L refused to do work.  (*Id.*).  The FBA listed five specific steps to be taken by BSD in response to these recurring behaviors.  (*Id.*).  Additionally, the FBA outlined several curriculum modifications to be taken by BSD to address the behaviors.  (*Id.*).  One specific modification listed was that L would go to a separate recess to avoid contact with a particular student who appears to have been an instigator of L's behavioral outbursts.  (Hearing Officer's Final Decision and Order, p. 10).

The behavior support plan reviewed at that meeting outlined other changes in the space and curriculum that would address L's misbehaviors.  (*Id.*, p. 11).  Specifically, the behavior support plan allowed for the following seven changes: (i) L would be placed across the room and facing away from the child that triggered his aggressive behavior (change in space); (ii) L would be provided with a visual timer to indicate changes in schedule (change in instructional materials); (iii) L would be provided research-based methods such as Applied Behavior Analysis, Picture Exchange Methods, or story-based intervention (change in curriculum); (iv) L's functional routines in the classroom would be addressed (change in curriculum); (v) L would be provided

11

with a sensory diet (change in the curriculum); (vi) L would be provided with quiet time after recess, whereby he could listen to calming music and sleep until he awakened (change in curriculum); and (vii) L would have a designated time each day to work with his special education teacher on social skills (change in curriculum).  (*Id.*).  The plan also allowed for a specific method for L to communicate with his teachers.  This FBA and the changes made to address L's misbehaviors were implemented after the October 3rd meeting, not before.  (2014-11-13 Hearing Transcript, pp. 71-72).

On October 29, 2012, another programming conference was held, and in addition to reviewing classroom and home observations, L's IEP was reviewed.  (Hearing Officer's Final Decision and Order, p. 11).  L's mother was present at this meeting.  (*Id.*).  At that meeting it was agreed that reevaluation was needed for the purpose of measuring L's skill development in academic content areas.  (*Id.*, p. 12).  On November 28, 2012, another programing conference was held to review the results of the academic testing administered following the October 29, 2012 meeting.  (*Id.*).  At that November 28th meeting is was determined that L would begin receiving 600 minutes of general education and 1,500 minutes of special education per week.  (*Id.*).  This change reflected a 300 minute decrease in general education minutes and a corresponding 300 minute increase in special education minutes over the existing IEP already in place.  L's mother was present at this meeting.  (*Id.*).

From December 2012 until the time that the Parrishes withdrew L from BSD in March 2013, L exhibited a series of behavioral outbursts that ranged from mild disruptions all the way up to acts of aggression that resulted in physical harm done to various BSD employees.  On December 7, 2012 during one such outburst, L put his feet on his desk and pushed backwards.  (*Id.*, p. 13).  His chair collapsed, and as he was falling a teacher reached out and caught him before he hit the

ground.  (*Id*.).  L started screaming and kicking, and only calmed down after several other teachers came over to assist, applying deep pressure to his hands.  (*Id*.).  Also during this incident, one of the teachers had to restrain L's feet by placing her hand over them.  (*Id*.).  The teacher did this to prevent L from kicking her in the face.  (*Id*.).  On December 13, 2012, L began hitting an instructional assistant.  (*Id*., p. 14).  Later in that same day, when another student made a loud noise, L began screaming and pushing a classroom divider toward the student.  (*Id*.).  When a teacher intervened to prevent harm to the other student, L began striking the teacher in her head with his fists.  (*Id*.).  Teachers again applied deep pressure to L's hands and held down his legs from striking the teachers.  (*Id*.).  During this incident L also attempted to bite a teacher.  (*Id*., p. 15).  Additionally during the process of calming L down, teachers rubbed L's back.  (*Id*., p. 15).  Following these incidents, L's mother was in contact with the school principal, and L's mother requested that L spend less time in the autism room.  (*Id*.).

On February 6, 2013, L hit a pregnant teacher in the presence of L's mother, and L's mother expressed concern for the unborn baby.  (*Id*., p. 16).  On the same date, L pushed another student off of playground equipment, and when an instructional assistant intervened to prevent harm to the other student L punched the instructional assistant in the eye.  (*Id*., p. 17).  L continually hit and kicked the instructional assistant.  (*Id*.).  The school nurse arrived to help, and the incident continued with L attempting to strike the school nurse with his hands and feet.  (*Id*., p. 18).  The school nurse took L by the hand and attempted to get him to leave the playground but L refused.  (*Id*.).  Once there were enough staff members present to safely conduct a CPI transport[3] with L,

---

[3] "[A] CPI transport is one person on each side of a student, assisting the student in walking to a safe location. The student has feet on the ground at all times. If a student sits down and refuses to walk, staff is permitted to assist the student to their feet again. Staff is not permitted to drag a student if they refuse to walk. A transport is never used as a punishment or to correct behavior." (Hearing Officer's Final Decision and Order, p. 21).

they did so.  (*Id*.).  Once L was inside the school, he hit a staff member in the jaw, and then pushed over a bookshelf.  (*Id*.).

On February 8, 2013, another programming conference was held to address L's behavior issues.  (*Id*., p. 19).  It was decided at that meeting that L would be moved to an academic self-contained classroom.  (*Id*.).  Also at that meeting, it was decided that the team would develop a crisis plan.

On March 12, 2013, L tried to charge another child in an attempt to attack him.  (*Id*.).  Later in that day L ran out of the classroom and began running around the school.  (*Id*.).  Again later in that day L hit yet another student and left the room with a teacher, who had L remain in the office area for some time.  (*Id*.).  The following day, another programming conference was held to discuss L's mother's complaints and to discuss the behavior plan.  (*Id*.).  At that meeting, L's mother submitted a note from Bentonville Pediatrics, P.A. which stated that L had panic attacks, and that Bentonville Pediatrics, P.A. recommended that BSD not restrain L or put him in a seclusion room. (*Id*., p. 20).  At this meeting L's mother said that she didn't want anyone to put their hands on L, but the representatives of BSD made it clear that they would have to put their hands on L if necessary to protect other students and staff.  (*Id*.).  This meeting ended with L's mother and L's student advocate yelling and storming out of the meeting.  (*Id*.).  The very next day on March 14, 2013, the Parrishes withdrew L from BSD.  (*Id*.).

At Elm Tree Elementary School there is a cool down room where L was sometimes placed following his outbursts.  (*Id*., p. 22).  When used, the door to the cool down room remained open, and an adult was present in the room with L at all times.  (*Id*.).

14

### b.    Discussion

BSD's reason for seeking summary judgment is simply that the "Hearing Officer properly found that the District committed no procedural or substantive violations of the IDEA."  (Doc. 138, p. 13).  Rather than assign error to the Hearing Officer or point out what part of the decision the Parrishes disagree with, the Parrishes argued their entire case.  (Doc. 162, pp. 3-16).  The Parrishes alleged the following violations of the IDEA: (i) BSD failed to train its employees on how to educate students with autism and how to comply with the IDEA (*Id*., p. 5); (ii) BSD used physical restraint and seclusion on L (*Id*., p. 6); (iii) BSD did not address the lack of academic progress or the increasing severity, frequency, and intensity of L's disability related behaviors (*Id*.); (iv) BSD failed to provide data to indicate that the Behavior Intervention Plan was implemented and that BSD failed to collect data to evaluate the effectiveness of the plan (*Id*., p. 10);  (v) BSD used strategies with L that were not supported by empirical evidence and bordered on abusive (*Id*.); (vi) BSD failed to educate L in the least restrictive environment (*Id*., p. 11); and (vii) BSD failed to involve L's parents in making placement decisions (*Id*., p. 14).

In BSD's reply, rather than actually addressing the theories raised by the Parrishes or point to the Hearing Officer's opinion with citations to how the Plaintiffs' theories were found to be meritless, BSD submitted a short response mostly criticizing Plaintiffs' counsel.[4]  (Doc. 180, pp. 2-3).  BSD's response then selectively quoted the Eighth Circuit without actually identifying the standard under which the Court must review BSD's own motion.  (*Id.*).  The Court will now address each one of Plaintiffs' alleged IDEA violations.

---

[4] Even though BSD's motion for summary judgment on this claim triggered the Court to review the thousands of pages in the administrative record, BSD's briefing on this point is four pages long, and provides no guidance to the Court in analyzing the administrative record.

In reviewing whether any of BSD's actions amounted to a violation of the IDEA the Court must employ a two prong analysis as outlined by the Eighth Circuit. The first inquiry is whether the school complied with the procedures set forth in the IDEA. *K.E. ex rel. K.E,* 647 F.3d at 804. Second, the court must decide whether the resulting IEP was "reasonably calculated to enable the child to receive educational benefit." *Id.* (citations omitted). "If these requirements are met, the [school district] has complied with the obligations imposed by Congress and the courts can require no more." *Id.*

      **i.**    **The Parrishes' Allegation that BSD Failed to Train its Employees on How to Educate Students with Autism and How to Comply with the IDEA. (Doc. 162, p. 5).**

The Parrishes allege that BSD failed to train its employees on how to educate students with autism and on how to ensure compliance with the IDEA. (Doc. 162, p. 5). School districts must take reasonable steps to train and prepare a student's teaching staff. *Light v. Parkway C-2 Sch. Dist.*, 41 F.3d 1223, 1230 (8th Cir. 1994). There is ample testimony in the record about the training that BSD provided for its teachers. (2014-11-12 Hearing Transcript, pp. 43-46, 123-24, 149-50, 154); (2014-11-13 Hearing Transcript, pp. 47, 51, 61-63, 75-76, 230, 232-37, 240, 246-48, 255); (2014-11-14 Hearing Transcript, pp. 32, 34-35, 40-43, 48-50). While the Parrishes may have alternative theories about what training might have been best or what additional steps the school might have taken, BSD's training regimen does not bend to the whims of any one particular parent. The record shows that BSD took reasonable steps to train its teachers, and that is all that is required. Therefore, the Court concludes that BSD's training of its teachers did not result in a denial of a FAPE that would result in a violation of the IDEA.

> ii.   **The Parrishes' Allegation that BSD's Use of Physical Restraint and Seclusion on L Amounted to a Violation of the IDEA.  (Doc. 162, p. 6).**

BSD did not use physical force and seclusion in a way that denied L a FAPE.  It is undisputed that BSD employees touched L.  The issue is whether that touching amounted to a violation of the IDEA.  Teachers rubbed L's back, applied deep pressure to L's hands, touched L's hair, held down L's feet to avoid being kicked in the face, hugged L to calm him down, and placed him in the cool down room under adult supervision.

The Court concludes that nothing about this application of physical force amounted to a procedural violation of the IDEA.  BSD arranged many meetings, both formal and informal, at which L's behavioral issues were addressed.  BSD held programming conferences on September 4, 2012 (Hearing Officer's Final Decision and Order, pp. 6-7), October 3, 2012 (*Id*., p. 8), October 29, 2012 (*Id*., p. 11), November 28, 2012 (*Id*., p. 12), February 8, 2013 (*Id*., p. 19), and March 13, 2013 (*Id*., p. 19).  The day after the last programming conference the Parrishes withdrew L from BSD.  (*Id*.).  L's mother was present at all of these intermittent programming conferences.  At these conferences behavioral progress was updated, test results were reviewed, strategies were discussed, plans were made, and BSD employees involved L's mother in making all of these decisions.  BSD was transparent about all of L's behavioral issues, and communicated about the physical restraints that were being used.  Documentation from these meetings makes it clear that BSD's use of physical force was an issue presented to L's mother.  The point in time at which physical force became an issue was the March 13, 2013 meeting where L's mother asked that BSD employees stop putting their hands on L, and when she was told that this would not be possible given her son's aggressive outbursts, L's mother began yelling and stormed out of the meeting. Nothing about L's mother's extensive participation in this entire process could amount to a procedural violation of the IDEA.

Next, the Court cannot conclude that BSD's use of physical restraint substantively resulted in denying L of a FAPE in violation of the IDEA. After reviewing the record, the Court agrees with the Hearing Officer in concluding that:

> [T]he evidence suggests that the District continually acted quickly in response to Student's escalating behavior, particularly in light of the short time frame, approximately 48 days, in which Student attended school between September 30, 2012 and March 13, 2013. It is impossible to know if the crisis plan contemplated by the District would have been successful on account of the fact that Parents removed Student from the District prior to the development and implement of the plan.

(*Id.*, p. 41). Although the report of Plaintiffs' expert, Dr. Travers, seems to identify other methods that could have been used or alternative ways in which BSD could have handled L's misbehavior, the Court agrees with the Hearing Officer that procedurally the complaint is suspect. (*Id.*). Furthermore, the Court notes that ensuring that a child obtains a FAPE does not mean providing a perfect education in conformity with every wish of parents.

On the issue of using CPI transports to move L, the Court concludes that BSD had no choice but to use this method. While the Plaintiffs criticize BSD's decision to use this tactic, it is unclear what other alternative BSD had. L was aggressive, posed a threat to other students and staff members, and would sit down on the ground and refuse to move. BSD used a strategy to deal with this behavior that is expressly excluded from the definition of "physical restraint" under the ADE Guidelines for the Use of Restraint. (*Id.*, pp. 41-42). Under that fact alone, the use of the CPI transport seems to be a nonstarter for constituting restraint as long as the procedure was followed correctly. There is no proof cited by Plaintiffs showing that the procedure was used incorrectly.

The Hearing Officer noted that "[a] significant portion of the transcript in this case is dedicated to questioning regarding seclusion, restraint, and whether the actions taken to address

[L]'s aggressive behavior fell within either category." (*Id.*, p. 42). While the Court has also reviewed this testimony, a part of that review involves deciding which party to believe. The Court is in agreement with the Hearing Officer because the Court determines that the weight of the evidence is in favor of BSD on this issue. Also, the Court realizes that there is somewhat of a credibility determination that is to be made in weighing this testimony and the Hearing Officer is in the best position to make that determination. *See K.E. ex rel. K.E.*, 647 F.3d at 802.

Plaintiffs repeatedly use the word "seclude" in discussing BSD's use of the cool down room. The room used has a conference table and chairs, and children's art on the walls. A BSD employee testified that L was never locked inside, but rather that an adult was present in the room at all times. (Hearing Officer's Final Decision and Order, p. 22). The Hearing Officer concluded that this was not seclusion. The Court agrees.

Further, the Parrishes were long aware that physical touch was effectively being used to control L's outbursts. And the Parrishes did not object. In an October 3, 2012 meeting at which L's mother was present, the team reviewed L's FBA. That FBA includes the following statements:

> [L] is spoken to in a soft calming voice to diffuse his anger. Deep pressure and a soft touch to the hair along with singing are also used as needed. Dividers use to keep peer and adult attention to a minimum. When using these techniques, [L] is very easily calmed down.

(TAB 1P - IEP - 10-03-2012, p. 4). The record reflects that the October 3rd meeting "concluded with [L's mother] saying that it was one of the best meetings that they had been in." (2014-11-13 Hearing Transcript, p. 70). The advocate at the meeting on behalf of L's mother also came to this same conclusion. (*Id.*). L's mother confirmed this in an email that she sent after the meeting. (*Id.*, p. 72).

The first time that the Parrishes raised serious concerns about the use of force was on March 13, 2013. (*Id.*, p. 19). At that meeting, L's mother yelled and stormed out of the meeting after

BSD told her that it would continue using physical force to prevent L from harming others.  (*Id.*).

The very next day on March 14, 2013, the Parrishes withdrew L from BSD.  (*Id.*).  The Hearing

Officer best addressed this by concluding:

> Parents testified that they ultimately removed [L] from school because the District refused to stop restraining him. First, there is no evidence to suggest that [L] was ever restrained within the definitions provided in the Arkansas guidelines. In addition, there is no evidence that the "cool down" room, as described above, is a seclusion room. *It is illogical and unreasonable for Parents to have the expectation that [L] will never be transported in situations in which he is being aggressive with peers and staff, or, alternatively, posing a physical danger to himself.* Certainly, if [L] was the victim of another student's violent behavior, it seems unlikely that Parents would want the school to step back and refuse to protect [L].

(*Id.*, p. 43) (emphasis added).  The Court agrees with the Hearing Officer, and finds the Parrishes'

requests unreasonable in light of L's repeated and severe acts of physical aggression.

### iii.   The Parrishes' Allegation that BSD did not Address the Lack of Academic Progress or the Increasing Severity, Frequency, and Intensity of L's Disability Related Behaviors.  (Doc. 162, p. 6).

BSD did not deny L a FAPE by failing to address L's lack of academic progress or

increasing behavior issues. As mentioned above, BSD held programming conferences on

September 4, 2012 (Hearing Officer's Final Decision and Order, pp. 6-7), October 3, 2012 (*Id.*, p.

8), October 29, 2012 (*Id.*, p. 11), November 28, 2012 (*Id.*, p. 12), February 8, 2013 (*Id.*, p. 19), and

March 13, 2013 (*Id.*, p. 19).  These meetings proposed a multitude of interventions, and updated

all parties on the progress that had been made in implementing the interventions agreed upon at

previous meetings.  L's mother was at all of these meetings.  Furthermore, there were many

informal meetings and communication with L's mother.  (*Id.*, pp. 29-30).  The record is clear that

BSD took many steps and that the Parrishes were involved along the way.  The Court finds this

did not amount to procedural or substantive violations of the IDEA.

### iv.   The Parrishes' Allegation that BSD Failed to Provide Data to Indicate that the Behavior Intervention Plan was Implemented and that BSD Failed to Collect Data to Evaluate the Effectiveness of the Plan. (Doc. 162, p. 10).

BSD did not deny L a FAPE by its handling of data to show that L's Behavior Improvement Plan was implemented or to show that the plan had been effective.  It should be noted that the entire period over which this alleged failure took place was 48 school days. [5]   (*Id*., p. 29).  As shown by the five programming conferences and the accompanying documentation that took place over that 48 day time period, the Behavior Improvement Plan was being implemented, changed, and adapted to meet L's needs very frequently.  On average, BSD was holding meetings and revisiting the plan once every two weeks.  These meetings were informed by the observations, notes, and theories of the BSD employees and by L's mother and advocate.  It is not entirely clear what type of "data" Plaintiffs allege BSD failed to collect, but that may be because this argument is somewhat at odds with the rest of Plaintiffs' IDEA claim.  If BSD had held fewer meetings and made less frequent changes to L's Behavior Improvement Plan, then there might have been more data collected because the plan would have been in existence longer.  But if BSD had held fewer meetings and left the original plan in place longer, then this would bolster Plaintiffs' claim that BSD did not do enough to adequately address L's misbehavior.  Thus this claim cuts against other claims alleging violations of the IDEA.

Of course it is also possible that there would have been more data and that BSD would have done more to evaluate the plan's effectiveness, but after a programming conference when L's mother became upset, the Parrishes immediately withdrew L from BSD.  Considering that a school year in Arkansas is 180 days and that this entire alleged violation took place over a 48 day period

---

[5] L was enrolled in a nontraditional year-round school.  So while the time spanned more than 48 days on a calendar, it was only 48 school days given extended breaks and vacations.

during which BSD revisited L's behavior plans five times at separate programming conferences, BSD's actions are reasonable.  BSD's handling of the implementation of this plan and BSD's collection of data arising from the plan did not amount to a procedural or substantive violation of the IDEA.

> v. **The Parrishes' Allegation that BSD Used Strategies with L that were Not Supported by Empirical Evidence and Bordered on Being Abusive. (Doc. 162, p. 10).**

The strategies used by BSD were not abusive, and they do not rise to the level of an IDEA violation.  *See* Section III.A.1.b.ii above.  L's mother was present over the course of the five separate programming conferences held by BSD, and there is "no evidence in the record to suggest that [BSD] refused to consider suggestions from [L's mother] or [L's advocate]."  (*Id.*, p. 30). Furthermore, the strategies used by BSD were in compliance with the IDEA.  The Court is not an educational policy review board for every decision made by a school.

> [C]ourts must be careful to avoid imposing their view of preferable educational methods upon the States. The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child.

*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 207 (1982).[6]  A court must ensure compliance with the IDEA, and educational decisions that are shown to be unreasonable are potentially subject to criticism or reversal.  But it is also clear that the IDEA does not impose a standard of perfection.  Moreover, the IDEA "does not require states to make available the *best* possible option."  *Springdale Sch. Dist. No. 50 of Washington Cty. v. Grace*, 693

---

[6] In the 1990 amendments to the Education for All Handicapped Children Act of 1975 (EAHCA), it was renamed the IDEA.  For all pre-1990 cases that refer to the EAHCA, the Court will simply refer to the act as the IDEA so as to avoid confusion by adding an unnecessary acronym.

F.2d 41, 43 (8th Cir. 1982) (emphasis in original).  Rather, the IDEA exists "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE] by such agencies."  20 U.S.C. § 1415; *B.S. ex rel. K.S.*, 799 F.3d at 1219.

Whether the specific strategies settled upon at the numerous meetings between BSD officials and L's mother were perfect, or supported by more educational policy research than other strategies available, is not a question for a federal district court in review of a state's IDEA proceedings.  After reviewing the record, the Court cannot find any strategy implemented by BSD that should draw a reversal.  BSD ensured that the procedural safeguards required by the IDEA were in place.  Therefore, the Court concludes that the strategies used by BSD did not amount to a violation of the IDEA.

> ### vi.    The Parrishes' Allegation that BSD Failed to Educate L in the Least Restrictive Environment.  (Doc. 162, p. 11).

BSD did not fail to educate L in the least restrictive environment.  The IDEA requires a school to educate children with disabilities in the least restrictive environment, meaning that a disabled student is to be educated with non-disabled students to the "maximum extent appropriate."  34 C.F.R. § 300.114.  The Eighth Circuit has interpreted what this standard means:

> [T]he IDEA creates a preference for mainstream education, and a disabled student should be separated from her peers only if the services that make segregated placement superior cannot "be feasibly provided in a non-segregated setting." *Roncker v. Walter,* 700 F.2d 1058, 1063 (6th Cir. 1983). Nevertheless, while endorsing *Roncker,* we have emphasized that the statutory language "significantly qualifies the mainstreaming requirement by stating that it should be implemented 'to the maximum extent *appropriate,*' 20 U.S.C. § 1412[a](5) (emphasis added), and that it is inapplicable where education in a mainstream environment 'cannot be achieved *satisfactorily.*' *Id.* (emphasis added)." *A.W. v. Northwest R–1 Sch. Dist.,* 813 F.2d 158, 163 (8th Cir. 1987). Thus, removing a child from the mainstream setting is permissible when "the handicapped child would not benefit from mainstreaming," when "any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not feasibly be provided in the non-segregated setting," and when "the handicapped child is a disruptive force in the non-segregated setting." *Roncker,* 700 F.2d at 1063.

*Pachl v. Seagren*, 453 F.3d 1064, 1067–68 (8th Cir. 2006).  This standard makes it clear that educating students in a separate environment is not prohibited, but permits an IEP team—including the parent or guardian of a student—to determine that education in an integrated environment cannot be accomplished such that education in a segregated setting is warranted.

Pursuant to the IEP dated March 30, 2012, L was to receive 900 minutes of general education and 1,200 minutes of special education per week.  (Parent's Exhibits, p. 82).  On November 28, 2012, a programing conference was held and it was determined that L would begin receiving 600 minutes of general education and 1,500 minutes of special education per week. (Hearing Officer's Final Decision and Order, p. 12).  Under these facts, the Parrishes appear to be arguing that placing their child in a general education setting for 600 minutes per week and in a special education setting for 1,500 minutes per week amounts to a failure to educate their child in the least restrictive environment.  The Parrishes have cited many cases from many circuits on this topic, but none of those cases suggest that under the facts of this case BSD failed to educate L in the least restrictive environment.  L was in part being educated in a less restrictive environment prior to November 28, 2012, but the IEP team met and determined that the current arrangement was not working.  L's role as a disruptive force in the general education setting was a substantial basis for this determination.  Furthermore, the decision to increase L's segregation from the general education setting was not a decision to segregate L for the entire school day.

Like the data collection argument, the Parrishes' argument here is at odds with the rest of the IDEA claim: if the IEP team had not met at all, or failed to consider other placement options for L, it would bolster the Parrishes' claim that BSD had not adequately addressed L's failure to make academic progress.  Under these facts, the Court concludes that BSD did not fail to educate L in the least restrictive environment.

      **vii.**     **The Parrishes' Allegation that BSD Failed to Involve L's Parents in Making Placement Decisions. (Doc. 162, p. 14).**

BSD did not fail to involve L's parents in making placement decisions. The IDEA guarantees parents the right "to examine all records relating to [their] child and to participate in meetings with respect to the identification, evaluation, and *educational placement of the child*, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child." 20 U.S.C. § 1415 (emphasis added). Placement decisions must be "made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options." 34 C.F.R. § 300.116. More specifically, in implementing the IDEA in Arkansas, the ADE requires that "[e]ach public agency must ensure that a parent of each child with a disability is a member of any group that makes decisions on the educational placement of the parent's child." ADE Reg. 9.02.3.1. The Hearing Officer's examination of this issue did not address the specific factual allegations raised by the Parrishes here, and rather conclusively stated "it is the conclusion of this Hearing Officer that Parents were given a meaningful opportunity to participate in the modification of the Student's IEPs and the development of [behavior plans]." (Hearing Officer's Final Decision and Order, p. 30). Therefore, this final allegation raised by the Parrishes requires the Court to more fully articulate the analysis on this issue.

As evidence that BSD failed to involve L's parents, the Parrishes allege that BSD unilaterally made two placement decisions. First, L was sent to a fourth grade recess instead of the third grade recess. (Doc. 162, p. 14). Second, "L was moved to the AU classroom on March 12, 2013." (*Id.*). Regarding L's change in recess, there is no cited authority that this was a change in placement. L was not denied a recess, rather he was moved to another recess to avoid contact with a student who had been a known trigger of L's misbehavior. Although the Hearing Officer

did not get into the details of this in the final opinion, the Court looked over the transcripts from the hearing to better understand this change. The testimony of L's mother reveals that the reason for this change in recess was that the other student had threatened to kill L. (2014-11-14 Hearing Transcript, p. 195). Immediately changing a student's recess in light of this threat seems to be a prudent decision by BSD, and the Parrishes do not demonstrate that changing L's recess amounted to a placement change. This action by BSD did not violate the IDEA.

In support of the allegation that BSD unilaterally changed L's placement on March 12, 2013, the Parrishes cite to a declaration made by L's mother that states in part that the school called her on that date, and told her that "L was being moved back to the AU classroom without having a IEP meeting." (Doc. 161-2, ¶ 50). Additionally, the Parrishes support this allegation with a citation to the due process hearing record, in which L's mother testified on direct:

> **L's Mother**: His last day of school, I remember driving him to school, and I received a phone call from Ms. Summerford, who was the assistant principal, and she wanted to have a conversation with me. By that point, I was already in the school parking lot, so I had just said, "I'll come in and have a talk with you, if that's okay." We met in the office in one of their conference rooms. Ms. Summerford, the assistant principal, was in there, and Ms. Fogarty, who was the self-contained teacher, the classroom, they notified me that that day, that morning [L] was going to move back into the autism classroom, from Ms. Fogarty's room back to the autism classroom.
> **Counsel**: Okay. I don't see any IEP meeting documentation about that, was that an IEP meeting?
> **L's Mother**: No, it was not.
> …
> **Counsel:** You said that he didn't have time to adjust?
> **L's Mother**: Correct.
> **Counsel:** What would he be adjusting to?
> **L's Mother**: A Moving from Ms. Fogarty's room, self-contained, back to the autism classroom.
> **Counsel**: Now, you said they called you when you were in the parking lot.
> **L's Mother**: Uh-huh. (Indicated yes.)
> …
> **Counsel**: [L] had already gone to the classroom?
> **L's Mother**: He had went to Ms. Fogarty's room at that point.

>**Counsel**: So, did you discuss that with them? Were they going to pull him out of
>the room and put him in the autism room?
>**L's Mother**: Yes. After I requested him not to go back to the room, they said he
>either had to go to that room, the autism room, or he had to go home. So, there
>wasn't an option, he had to go to the autism classroom. So, I asked to see [L] before
>he was brought to the autism classroom.

(2014-11-14 Hearing Transcript, pp. 191-94). From the testimony that followed, L's mother stated that L then was sent into the AU classroom before any IEP meeting was held. (*Id.*, pp. 194-96).

Throughout the direct examination of L's mother, BSD's counsel entered frequent objections, but none about her testimony on this point. On cross examination of L's mother, despite aggressive questioning, BSD's counsel did not cross examine on this point or refute this testimony. (2014-12-15 Due Process Hearing Transcript, pp. 63-158). The above testimony was referring to March 12, 2013, the day that L was moved to the AU classroom. (2014-12-15 Due Process Hearing Transcript, p. 102). The record is also clear that BSD held an IEP meeting on March 13, 2013, the day after L's move back to the AU classroom. (TAB 1T - IEP - 03-13-2013). At that meeting, the notes state in part: "discussed his change from Resource room to the AU room due to the need of more structure." (*Id.*, p. 1). Prior to March 12, 2013, the status quo can best be shown by the notes from the immediately preceding IEP meeting. Records indicate that the February 8, 2013 meeting was scheduled because "Mom requested a conference on 2/4 to discuss a move out of the Autism room for services and into the self-contained classroom for current services." (TAB 1S - IEP - 02-08-2013, p. 1). The meeting notes state "[L] is moving to the academic self-contained classroom. Christi is now his caseload teacher where more focus can be on academics." (*Id.*, p. 2). The unrefuted testimony of L's mother combined with the lack of documentation of notice prior to moving L to the AU classroom, show that L's educational placement was altered in some way without holding an IEP meeting as the school had previously done.

These facts raise three issues: first, whether BSD's decision on March 12, 2013, to move L from the more general special education classroom to the AU classroom constitutes a change of placement such that the notice and participation requirements of the IDEA would be triggered; second, whether BSD made this decision unilaterally, without the meaningful participation of L's parents; and third, whether there is an exception to the notice requirement prior to making a change in placement that would excuse BSD's alleged failure to involve L's parents.

First, "a change in educational placement relates to whether the student is moved from one type of program—i.e., regular class—to another type—i.e., home instruction. Or it may also occur when there is a significant change in the student's program even if the student remains in the same setting." *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1056–57 (9th Cir. 2012) (quotations and citations omitted). There is evidence that a difference exists between BSD's general special education classroom and the AU classroom. (2014-11-13 Hearing Transcript, pp. 112-14). Also, records reflect that moving L from the more general special education classroom to the AU classroom was regarded as a change in placement by BSD since it documented the move as such. (TAB 1S - IEP - 02-08-2013, p. 1). Reason suggests that moving L back to the AU classroom on March 12, 2013 should also be regarded by BSD as a change in placement. Furthermore, there is a lack of documentation to conclude that the March 12 meeting was an IEP meeting that would serve as the proper notice of the change. Thus, the Court concludes that BSD did change L's placement on March 12, 2013.

Second, when making a change in educational placement, a school cannot refuse to consider a parents' concerns nor can it predetermine the educational program for a disabled student prior to meeting with the parents, because the core of the IDEA is "the cooperative process that it establishes between parents and schools." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53

28

(2005).  The unrefuted testimony of L's mother regarding her interaction with BSD on March 12, 2013 shows that BSD had predetermined that L was to be moved to the AU classroom, and that BSD did not take her perspective into account.  So even assuming that L's mother's meeting with BSD on March 12, 2013 could count as sufficient notice of the change, it was not a meeting where she was invited to be part of a cooperative process.  The Hearing Officer's only conclusion regarding this was the general statement that "[t]here is no evidence in the record to suggest that District [sic] refused to consider suggestions from Parents or [their advocate]."  (Hearing Officer's Final Decision and Order, p. 30).  Since the Hearing Officer didn't specify that this conclusion was based on a credibility determination, the Court cannot square that general conclusion with the evidence cited in this paragraph above.  Contrary to the Hearing Officer's conclusory statement, the testimony does show evidence that BSD failed to consider the suggestions of the Parrishes.

Third, even though there was a change of placement and some evidence to support the conclusion that BSD did not take the Parrishes' views into account when making the decision to change L's placement, the Court still does not conclude that BSD denied L a FAPE so as to rise to the level of an actionable violation of the IDEA.  There is an exception created for temporarily changing a child's placement.

> School personnel under this section may remove a child with a disability who violates a code of student conduct from his or her current placement to an appropriate interim alternative educational setting, another setting, or suspension, for not more than 10 consecutive school days (to the extent those alternatives are applied to children without disabilities).

34 C.F.R. § 300.530.  Given the ample evidence of L's misbehavior, had BSD developed a record on this issue or actually presented any substantive argument in its brief, this exception might have been asserted.  Even if it does apply though, the evidence in the record is inconclusive.  At the February 8, 2016 meeting where L's placement changed from the AU classroom to the more

general special education classroom, BSD's documentation of notice to the parent designates the "type of conference" as "educational placement of your child." (TAB 1S - IEP - 02-08-2013, p. 3). The March 13, 2013 notice does not designate the meeting as one relating to educational placement, but the notes do mention the change. (TAB 1T - IEP - 03-13-2013, p. 1) (the notes state: "discussed his change from Resource room to the AU room due to the need of more structure."). So even if BSD attempted to claim a 10 day exception under § 300.530 its documentation does not support that conclusion.

Nonetheless, whether the March 13, 2013 meeting was sufficient to comply with a 10 day exception under § 300.530 is immaterial for two reasons. First, at the end of the 10 day period under which BSD would have had to correct the unilateral placement change under § 300.530, L was not even enrolled at BSD because the Parrishes' had withdrawn him. So in effect, this change did not ripen into an IDEA violation. Second, even if § 300.530 does not apply, this alleged violation cannot be said to have denied L a FAPE so as to violate the IDEA. After careful review of the record, the Court concludes that if there were a technical violation regarding the requirement to notify the Parrishes before a placement change, it did not affect the IEP and did not otherwise deprive L of educational benefit. *See Lathrop R-II Sch. Dist. v. Gray*, 611 F.3d 419, 427 (8th Cir. 2010) (concluding that technical failure of a school to schedule a meeting at a "mutually agreed upon location" as required by procedural requirement did not affect the IEP and did not deprive child of educational benefits); *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 854 (6th Cir. 2004) (noting that "minor technical violations may be excused"). Given that L's placement was changed on March 12, 2013, L's mother met with BSD in a formal IEP meeting on March 13, 2013, the Parrishes' then withdrew L from BSD on March 14, 2013, and L did not attend school after March 12, 2013, L was only present at BSD for one school day in a placement that arguably

failed to comply with the IDEA.  Additionally, in light of the fact that there were five separate programing conferences over the 45 day period, this violation is not inconsistent with the Hearing Officer's conclusion that the "Parents were given a meaningful opportunity to participate in the modification of the Student's IEPs and the development of [behavior plans]." (Hearing Officer's Final Decision and Order, p. 30).  The Court concludes that BSD's actions did not deprive L of a FAPE that rises to the level of an actionable IDEA violation.

### c.      Conclusion on IDEA Claim

After examining the parties' briefs, reviewing the entire administrative record, carefully reading the Hearing Officer's written opinion, and looking at the relevant case law, the Court concludes that BSD's actions did not deprive L of a FAPE under the IDEA.  Therefore, BSD's motion for summary judgment on the Parrishes' IDEA claim is granted.

### 2.      § 1983 Claim for Violation of Bodily Integrity

Summary judgment will be awarded in favor of BSD on the Parrishes' claim for violation of bodily integrity.  The Parrishes raised procedural and substantive due process claims against BSD for alleged constitutional violations of L's Fourth and Fourteenth Amendment rights.  (Doc. 46, ¶ 102).  The amended complaint alleges that: "The Plaintiffs's children's [sic] had clearly established rights to bodily integrity and to due process, pursuant to the Fourth and Fourteenth Amendments, which were violated by the Defendants." (*Id.*, ¶ 108).  Thus, the Plaintiffs appear to be asserting a right to bodily integrity under both the Fourth and the Fourteenth Amendments. On April 28, 2016, the Court ruled that "Plaintiffs' claims for violation of their substantive due process rights are also DISMISSED for failure to state a claim." (Doc. 91, p. 18).  To the extent that their § 1983 claim involves a right to bodily integrity as a substantive due process right stemming from the Fourteenth Amendment, that claim has already been dismissed.  The issue still

pending is whether Plaintiffs have shown that BSD violated their Fourth Amendment right to bodily integrity. The Court concludes that they have not, and thus summary judgment will be entered in favor of BSD on the § 1983 bodily integrity claim.

The Fourth Amendment's protections apply to the actions of public school officials. *See, e.g., Shade v. City of Farmington,* 309 F.3d 1054, 1059–62 (8th Cir. 2002). The action alleged against a school under a § 1983 lawsuit must be a deprivation of rights resulting from an official policy. *C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347*, 591 F.3d 624, 635 (8th Cir. 2010) (*citing McVay v. Sisters of Mercy Health Sys.,* 399 F.3d 904, 909 (8th Cir. 2005). To allege a Fourth Amendment violation, a plaintiff must allege facts which indicate a seizure occurred and that it was unreasonable. *See McCoy v. City of Monticello,* 342 F.3d 842, 846 (8th Cir. 2003). Context is critical in assessing the reasonableness of actions, and the determination is made according to the totality of the circumstances. *C.N.*, 591 F.3d at 633 (citations omitted). "An authorized professional's treatment of a disabled person within the state's care is reasonable if his or her actions are 'not a *substantial departure* from accepted professional judgment, practice, or standards.'" *Id.* (*citing Heidemann v. Rother,* 84 F.3d 1021, 1030 (8th Cir. 1996)).

In *C.N.*, the Court found that physical restraint was not a substantial departure from accepted professional judgment in large part because such methods were proscribed in the child's IEP. 591 F.3d at 633. Even where application of such methods was "overzealous at times and not recommended," this still did not amount to a substantial departure from accepted professional judgment. *Id.* In the Parrish case, however, there is no clear evidence that any force was proscribed in L's IEP, and therefore the Parrish case does not squarely fit under this precedent. As such, the existence of an IEP cannot establish what would be a substantial departure from accepted professional judgment. Additionally, in their briefing on this claim, neither party has provided

32

citation to opinions by experts which would aid the Court in conclusively determining whether the facts in this case represent a substantial departure from accepted professional judgment.[7] Nonetheless, having carefully reviewed the instances of restraint used by BSD that the Parrishes cited to in their briefing as evidence of a Fourth Amendment violation, there is no cited instance of restraint used by BSD that could rise to the level of unreasonable under the circumstances. (Doc. 162, p. 20; *citing* Hearing Transcript - Parent's Exhibits, p. 279, 283-86 (held L when he pushed another student and punched and kicked several staff members[8])); (Doc. 162, p. 20; *citing* Hearing Transcript - Parent's Exhibits, p. 278 (hugged L when he was aggressive, and held L when he was kicking a teacher and punching her in the back of the head)).  Therefore, the Parrishes' § 1983 claim will be dismissed.

### 3.       Equal Protection Claim

Summary judgment will be awarded in favor of BSD on the Parrishes' equal protection claim.  An alleged equal protection violation on the basis of ability is subject to rational basis review.  *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356 (2001).  The plaintiff bears the burden of showing that the school district was without a rational basis for its treatment of the

---

[7] Plaintiffs' expert report concluded that BSD "actions departed substantially from accepted professional practice, judgement, [sic] or professional practice standards." (Doc. 118-1, p. 14).  However, Plaintiffs did not handle this report with the timeliness that it was due, instead disclosing it late and offering the excuse that they "released it to Defendants' Counsel within minutes of receiving the report."  (Doc. 115, p. 3).  On September 12, 2016, the Court excluded this report because it was not timely disclosed.  (Doc. 149).  Instead of relying on this type of expert report, Plaintiffs now instead make *per se* arguments against the use of force in schools. (Doc. 162, n. 10).  The Court rejects the argument that force is never allowed to be used in schools, especially when using force prevents harm to others.

[8] The Parrishes cite many different incident reports written by different BSD staff members as if pointing to evidence of different incidents.  However many of these incident reports all involve the same incident on the same date written from different points of view.  All of the incident reports show that L was being aggressive and BSD staff responded reasonably under the circumstances.

student.  *Id.* at 367.  Additionally, plaintiffs have the burden of showing that they are similarly situated to those who allegedly received favorable treatment.  *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994).

BSD urges the Court to grant summary judgment because it claims that the Parrishes have failed to meet this burden and have failed to identify any similarly situated student.  (Doc. 138, pp. 6-7).  BSD states that ensuring the safety of staff and students is a legitimate government purpose.  (*Id.*, pp. 7-8).  Furthermore, it points to testimony by Mrs. Parrish where she stated that she cannot identify any similarly situated student.  (*Id.*, p. 7).  The Parrishes do not offer any comparator and do not explain why BSD's stated reason is not legitimate.  Furthermore, the Parrishes argue that BSD "has produced no evidence that children with disabilities who did not have an autism diagnosis were physically restrained, secluded, and subjected to physical abuse like the Plaintiffs' children."  (Doc. 162, pp. 22-23).  The Parrishes improperly shift the burden of proof.  *See Klinger*, 31 F.3d at 731.  Because the Parrishes failed to meet their burden to show that BSD's actions cannot survive rational basis review, and because the Parrishes have not identified similarly situated students, their equal protection claim fails and summary judgment will be entered in favor of BSD.

### 4.    § 504 of the Rehabilitation Act Claim and ADA Claim

Summary judgment on the Parrishes' § 504 and ADA claims will be granted in favor of BSD.  When a plaintiff asserts § 504 and ADA claims based on educational services provided for disabled students, the plaintiff "must prove that school officials acted in bad faith or with gross misjudgment."  *Birmingham v. Omaha Sch. Dist.*, 220 F.3d 850, 856 (8th Cir. 2000).  When looking at the plaintiffs' alleged § 504 and ADA violations and finding proof of the necessary intent element, a court looks at the facts in the light most favorable to the plaintiffs to see if they

show bad faith or gross misjudgment by the school.  *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 888 (8th Cir. 2013).  In this context, showing bad faith "requires something more than mere non-compliance with the applicable federal statutes; [a] district's non-compliance must deviate so substantially from accepted professional judgment, practice, or standards as to demonstrate that it acted with wrongful intent."  *Id.*, at 882.

The Parrishes must show that BSD acted in bad faith or with gross misjudgment in using seclusion and restraint in the ways that it did.  As proof that BSD acted with the requisite intent, Plaintiffs allege that L was targeted for physical restraint, seclusion, physical abuse, and was denied needed supports, services, and accommodations.  (Doc. 162, p. 17 (*citing* Doc. 85-1, Doc. 85-2)).  As described in Section III.A.1.b above, after a thorough review of the IDEA record it is clear that BSD had a reasonable basis for every use of force against L while he was enrolled at BSD.  BSD acted in compliance with ADE regulations, and not in violation of the IDEA. Furthermore, many of the incidents that resulted in BSD physically restraining L came about because L lashed out at staff members and students with acts of physical aggression.  There is no evidence in the expansive record to show that BSD acted in bad faith or with gross misjudgment in its decisions to transport and restrain L.

There are many other allegations raised in the Plaintiffs' motion that might form the basis for theories of a § 504 or ADA violation.  However, no proof is cited that would support a jury in finding that BSD acted in bad faith or with gross misjudgment.  (Doc. 162, pp. 16-19).  Some of the facts cited by the Plaintiffs amount to nothing more than possible instances of statutory non-compliance, and some of the other facts, such as failing to allow L to participate in some school activities, fall short of even potentially showing statutory noncompliance.  But even statutory noncompliance alone does not constitute bad faith or gross misjudgment.  *B.M. ex rel. Miller*, 732

F.3d at 887.  As previously stated, the Eighth Circuit has held that showing bad faith or gross misjudgment requires "something more."  *Id.*  In further support of their argument for bad faith, the Plaintiffs assert:

> The District's failure to provide needed supports, services, and related services and instead intentional targeting of the Plaintiffs' children for physical restraint, seclusion, and abuse was made in bad faith. Further, the District's policy of secrecy and concealment of their use of physical restraint and seclusion and failure to notify the Parents that these method were being utilized (even after the children were injured) could certainly be viewed as evidence of bad faith by a jury.

(Doc. 162, p. 18).  Given the controlling precedent cited above, this could not be viewed by a jury as evidence of bad faith.  *B.M. ex rel. Miller*, 732 F.3d at 882.  The facts alleged, even when viewed in the light most favorable to the Parrishes, do not show bad faith or gross misjudgment by BSD.

This Court is aware of the differences between § 504/ADA claims and IDEA claims, and so the Court does not rely solely on the IDEA record in granting summary judgment here.  The Court has reviewed the Parrishes' brief opposing BSD's motion for summary judgment, looking for any additional evidence of the bad faith or gross misjudgment required for a § 504/ADA claim. Finding none, the Court concludes that summary judgment will be granted in favor of BSD on the Parrishes' § 504 and ADA claims against BSD.

**B.     BSD's Motion for Summary Judgment on All Claims Asserted by the Craig Plaintiffs.  (Doc. 143).**

**1.     IDEA Claim**

A motion for summary judgment is not defeated by merely showing a dispute of material fact, but rather triggers a more thorough review of the record.  *See* 3 Ams. with Disabilities: Practice & Compliance Manual § 11:314 (2016).  The Court has examined the parties' briefs, reviewed the entire administrative record, carefully read the Hearing Officer's written opinion, and looked at the relevant case law.  *See Swearingen*, 2016 WL 7155773.  For the reasons set forth

below, the Court affirms the Hearing Officer's decision in favor of BSD. Therefore, BSD's motion for summary judgment as to all claims submitted by the Craig Plaintiffs is granted.

### a.   Background

Early in A's life, A's mother noticed that A was not progressing at the same rate as his twin sister. (Hearing Officer's Final Decision and Order, p. 4). The Craigs enrolled A in speech, occupational, and physical therapies to address his development issues. *Id.* Before being enrolled in BSD, A was examined by a doctor who noted that A exhibited "high intellectual abilities" but struggled with self-regulation, peer relationships, and social reciprocity. (*Id.*). A then enrolled in BSD, attending kindergarten and first grade at Elm Tree Elementary School, and then transferring to Sugar Creek Elementary School for the second grade. (*Id.*, pp. 4-5).

At the beginning of the 2012-2013 school year—A's first grade year at Elm Tree Elementary—BSD was providing education under the existing IEP which was developed on June 1, 2012 and was valid until June 1, 2013. (*Id.*, p. 5). Under this existing IEP, A was to receive 800 minutes of general education and 1,300 minutes of special education per week. (*Id.*). A was listed as being at or above grade level. (*Id.*). The IEP also stated that A exhibited "physically aggressive behaviors towards staff and other students." (*Id.*). The IEP contained a "Behavioral Support Plan" ("BSP") to address these behaviors, and listed several supports that would be utilized to address A's behavior. (*Id.*, pp. 5-6). The IEP also contained academic goals, instructional modifications, supplemental aids, and supports to assist A in receiving a FAPE. (*Id.*, p. 6). One notable service set out in this IEP was that A was provided a paraprofessional staff member in all of his general education activities. (*Id.*). The documentation shows that A's parents were present at the June 1, 2012 meeting. (*Id.*). The IEP team also met for separate programming conferences on October 29, 2012 and December 5, 2012. (*Id.*, p. 7).

Between January and March of 2013, A behaved aggressively on nine separate occasions. Those behaviors included hitting, spitting, throwing objects, yelling, biting, pushing walls and objects, scratching, pulling hair (sometimes ripping out hair), head butting, pulling clothing, attempting to insert spit into electrical outlet, disrobing, attempting to choke himself by putting a finger down his throat, running around the room, banging on doors, banging on glass, pushing over cabinets, throwing furniture, throwing school supplies, tearing the back off of cabinets, dumping out containers, ripping handles off of closed shelves, throwing books, kicking computer monitors, kicking chairs and desks, and urinating on carpet. (*Id*., p. 8). The Hearing Officer concluded that BSD addressed these destructive behaviors by first implementing the interventions contemplated by the IEP and the BSP. (*Id*.). However sometimes these methods proved ineffective so BSD applied CPI holds,[9] and would transport A to a separate environment. (*Id*., pp. 8-9). A was sometimes given a time out in a conference room, with the door unlocked and a staff member located either in the room or right outside of the room. (*Id.*, p. 9). Sometimes A was restrained, but this was used as a last resort when A presented an imminent danger to himself or others. (*Id.*, pp. 9-10).

On March 8, 2013, a separate programming conference was held where the IEP team discussed transitioning A from the AU classroom to a general education setting and decided that a functional behavior analysis (FBA) would be completed and that A's BSP would be revised. (District's Hearing Exhibits (Tabbed), 1J – IEP – 03-08-2013). Additionally at this meeting, it was discussed that if A was unable to calm down, he would be removed to an alternative location. (Hearing Officer's Final Decision and Order, p. 10).

---

[9] A CPI hold is "a hold where staff, standing behind A, holds his wrists so that A's arms are wrapped around him." (Hearing Officer's Final Decision and Order, p. 9).

Between the programing conference on March 8, 2013 and May 30, 2013, A again behaved aggressively on at least eight separate occasions.[10] (*Id.*, pp. 10-11). This conduct was similar to A's conduct between January 2013 and March 2013. BSD first responded by utilizing the interventions described in the IEP and in the BSP, but when those interventions failed, BSD restrained and transported A to prevent harm to staff and students. (*Id.*, p. 11). During March and April of 2013, BSD completed functional behavior observations in preparation for the FBA. (*Id.*).

On May 30, 2013, the IEP team met to develop an IEP for A's second grade year. (*Id.*). A's parents were present at this meeting. (District's Hearing Exhibits (Tabbed), 1L – IEP – 05-30-2013). The documentation from this meeting again shows discussion of A's behavior, including that when A was confronted with a challenging task, his response was to "engage in aggressive and disruptive behavior (sitting/crawling on floor, running around the room, destruction of property, physical aggression, throwing objects, hitting, kicking, pushing, biting, spitting)." (*Id.*). The documentation also indicates that breaking from routine sometimes contributed to or caused this behavior. (*Id.*). The IEP provided for 400 general education and 1,700 special education minutes per week, and outlined six different annual goals for A. (Hearing Officer's Final Decision and Order, pp. 11-12). Although the IEP highlighted somewhat inconsistent assessment results, it appears that A was performing above grade level at that time. (*Id.*, p. 12).

_____

[10] The Court has reviewed the incident reports that detail these aggressive behavioral outbursts. (District's Hearing Exhibits (Tabbed), 03 Behavior Incident Reports). As an example of A's behavior, one report from April 16, 2013 reads "[A] was in the library and refused to go to the Reading Renaissance class which was on his schedule. He stated 'I am autistic I don't have to go!'. He swung his arm at teacher. He was walked to Mrs. Cynova's classroom where he wouldn't allow Mrs. Cynova to give him other options. He immediately started pushing over bookshelves. [A] then tried to harm another student. He was transported to the pass room. He calmed down and returned to class once he knew another class had gone to Reading Renaissance. This all occurred at the end of the day." (*Id.*). This incident is representative of A's behavior on other occasions.

Additionally, A had met all of his speech objectives and most of his math objectives for the previous school year, but had met none of his objectives for behavior, reading, or writing. (*Id.*, p. 13). Moving A to another school was also discussed at this meeting, but the topic was tabled amidst concerns from A's parents. (*Id.*).

The IEP team met again on June 10, 2013 to continue the discussion of A's placement and to conduct an annual review conference. (District's Hearing Exhibits (Tabbed), 1M – IEP – 06-10-2013). It was determined that A would remain enrolled at Elm Tree Elementary, but the topic of placement was left open. (*Id.*). Both of A's parents were present at this IEP meeting. (*Id.*). Between this meeting and August 2013, A had at least five separate outbursts of aggressive behavior, similar to that described as occurring between January and March of 2013. (Hearing Officer's Final Decision and Order, p. 13). Once again, BSD first resorted to the interventions described in A's IEP and BSP, but eventually A had to be restrained and transported for the safety of himself and others. (*Id.*).

Before A started the second grade, the Craigs consented to A's placement being changed to Sugar Creek Elementary. (*Id.*, p. 14). An IEP meeting was held on August 9, 2013 to discuss A's placement at this new school and to discuss a new IEP. (District's Hearing Exhibits (Tabbed), 1N – IEP – 08-09-2013). This new IEP also addressed setting event strategies, preventative strategies, teaching strategies, consequence strategies, and a crisis response plan. (*Id.*). A's parents were present at this meeting. (*Id.*). The IEP contained annual goals, instructional modifications, supplemental aids, and supports. (*Id.*). It appears that A's psychologist and behavioral consultants were also present. (*Id.*). Starting out at Sugar Creek Elementary for A's second grade year, it appears that there was a significant decrease in aggressive behavior incidents. (Hearing Officer's Final Decision and Order, p. 16). The cause of this reduction in misbehavior appears to be

40

attributed in part to the fact that Sugar Creek Elementary School operated on a traditional school year calendar, whereas A's previous school had operated on a year-round calendar with long periodic breaks and greater inconsistency in the school schedule. (*Id*.). Additionally, A's daily schedule was more consistent because A's attendance record during this time was consistent. (*Id*.).

In the spring semester of A's second grade year, however, things took a turn for the worse. A started showing up to school tardy, and was being checked out of school early. (2015-01-29 Hearing Transcript, pp. 360-61). A stopped riding the special education bus. (Hearing Officer's Final Decision and Order, p. 17). This resulted in a less consistent and predictable school schedule for A. (*Id*.). A's parents then made the decision to withdraw A from BSD. (*Id*.).

**b.      Discussion**

BSD's reason for seeking summary judgment is simply that the "Hearing Officer properly found that the District committed no procedural or substantive violations of the IDEA." (Doc. 144, p. 13). The Craigs' theories of this case are similar to the theories advanced by the Parrishes, but there are some critical differences. (Doc. 162, pp. 3-16). The Craigs alleged the following violations of the IDEA: (i) BSD failed to train its employees on how to educate students with autism and how to comply with the IDEA (*Id*., p. 5); (ii) BSD used physical restraint and seclusion on A (*Id*., p. 6); (iii) BSD did not address the lack of academic progress or the increasing severity, frequency, and intensity of A's disability related behaviors (*Id*.); (iv) BSD unilaterally determined that A did not need positive behavioral supports or strategies after placing him in the AU classroom (*Id*., p. 10); (v) BSD outlined vague goals and objectives that were not tailored to A's areas of need (*Id*.); (vi) BSD failed to provide any evidence that A's goals and objectives were being implemented (*Id*.); (vii) BSD used a variety of unorthodox and potentially harmful strategies that were not contained in a behavior plan (*Id*., p. 11); (viii) BSD failed to educate L in the least

41

restrictive environment (*Id.*); and (ix) BSD predetermined the placement of A in the AU classroom before he ever started kindergarten based on his autism diagnosis prior to conducting an IEP meeting and involving his parents in the placement decision. (*Id.*, p. 14).

BSD's reply to the Craig motion takes the same approach as its reply on the Parrish motion, focusing on BSD's criticism of Plaintiffs' counsel rather than on the merits of the response to BSD's motion for summary judgment. (Doc. 182, pp. 2-3). Despite the fact that the Craig and Parrish plaintiffs raised different theories for how BSD allegedly violated the IDEA, BSD's brief ignores the different factual situations and duplicates briefing from the Parrish brief. The Court will now address each one of Plaintiffs' alleged IDEA violations, following the rule statement set out in Section III.A.1.b above.

### i. The Craigs' Allegation that BSD Failed to Train its Employees on How to Educate Students with Autism and How to Comply with the IDEA. (Doc. 162, p. 5).

The Craigs allege that BSD failed to train its employees on how to educate students with autism and on how to ensure compliance with the IDEA. (Doc. 162, p. 5). *See* Section III.A.1.b.i. While the Craigs may have alternative theories about what training might have been best or what additional steps the school might have taken, BSD's training regimen need not cater to the desires of any one particular parent. The record shows that BSD took reasonable steps to train its teachers, and that is all that is required. Therefore, the Court concludes that BSD's training of its teachers did not result in a denial of a FAPE that would result in a violation of the IDEA.

### ii. The Craigs' Allegation that BSD's Use of Physical Restraint and Seclusion on A Amounted to a Violation of the IDEA. (Doc. 162, p. 6).

BSD did not use physical force and seclusion in a way that denied A a FAPE. It is undisputed that BSD employees touched A. Teachers transported A and restrained A. The issue is whether that touching amounted to a violation of the IDEA.

42

The Court concludes that nothing about this application of physical force amounted to a procedural violation of the IDEA.  BSD arranged many meetings, both formal and informal, at which A's behavioral issues were addressed.   BSD held programming conferences and IEP meetings on June 1, 2012 (Hearing Officer's Final Decision and Order, p. 5), October 29, 2012 (*Id.*, p. 7), December 5, 2012 (*Id.*), March 8, 2013 (*Id.*, p. 10), May 30, 2013 (*Id.*, p. 11), June 10, 2013 (*Id.*, p. 13), and August 9, 2013 (*Id.*, p. 14).   One or both of A's parents were present at all of these intermittent programming conferences and IEP meetings.  At these conferences behavioral progress was updated, test results were reviewed, strategies were discussed, plans were made, goals were set, and BSD employees involved A's parents in making all of these decisions.  BSD was transparent about all of A's behavioral issues, and communicated the physical restraints that were being used.  Documentation from these meetings makes it clear that BSD's use of physical force was an issue presented to A's parents.  Nothing about the Craigs' extensive participation in this entire process could amount to a procedural violation of the IDEA.

Furthermore, the Court cannot conclude that BSD's use of physical restraint substantively resulted in denying A of a FAPE in violation of the IDEA.  The Hearing Officer outlined the ADE advisory guidelines on the use of restraint, and the U.S. Department of Education definition of seclusion.  (*Id.*, pp. 31-35).  As used by BSD, the seclusion that Plaintiffs complain of is specifically excluded from the U.S. Department of Education definition of seclusion.  (*Id.*, p. 35). With respect to the ADE guidelines, BSD's use of restraint and seclusion was largely in compliance.  (*Id.*, p. 33).  Physical restraint was only used when A's behavior "posed imminent danger to himself or others, and was never used as punishment or a planned behavior intervention." (*Id.*, p.33).  BSD used only the amount of force necessary, and when A was restrained he was immediately released when he calmed down.  (*Id.*).  A was continually monitored when he was

restrained or secluded, and "[t]here is no evidence that [A] was verbally abused, ridiculed, or humiliated when physically restrained." (*Id.*, p. 34). While it is true that BSD's use of restraint and seclusion was not in compliance with the ADE guidelines 100 percent of the time, "a large majority of the ADE recommendation guidelines were followed in every restraint situation specific to [A]." (*Id.*, p. 33).

Furthermore, it should be noted that these ADE guidelines are advisory and not mandatory guidelines. The Craigs have not cited to any authority standing for the proposition that failure to comply with 100 percent of the ADE advisory guidelines 100 percent of the time results in denial of FAPE under the IDEA. Although the report of Plaintiffs' expert, Dr. Travers, identifies other methods that could have been used or alternative ways in which BSD could have handled A's misbehavior, the issue is not whether BSD could have acted differently but whether BSD's handling of A's misbehavior was reasonable. (*Id.*, p. 17-20). Ensuring that a child obtains a FAPE does not mean providing a perfect education in conformity with every wish of parents, and does not require complying with an outside expert's professional opinion developed with the benefit of hindsight.

On the issue of using CPI transports and restraints to control A, the Court concludes that BSD had no choice but to use these methods because it is unclear what other alternatives BSD had. A was aggressive, posed a threat to other students and staff members, and was completely disruptive to the functioning of the school. Using a CPI transport to control A is expressly not a restraint under the ADE Guidelines for the Use of Restraint. Under that fact alone, the use of a CPI transport does not give rise to an IDEA claim based on improper restraint as long as the procedure was followed correctly. There is no proof cited by Plaintiffs showing that the procedure was used incorrectly.

The Hearing Officer noted that "[a] significant portion of the transcript is dedicated to questioning regarding the issue of restraint." (*Id.*, p. 33).  While the Court has also reviewed this testimony, a part of that review involves deciding which party to believe.  The Court agrees with the Hearing Officer on the merits, and to the extent that any of the conclusions drawn were premised upon credibility determinations, the Court defers to the Hearing Officer.  *See* Section III.A.1.b.ii.

Plaintiffs repeatedly use the word "seclude" in discussing BSD's use of the cool down room.  The room in question is a conference room with furniture, windows, and an unlocked door with an adult present at all times.  The Hearing Officer concluded that this was not seclusion.  The Court agrees.  The Court finds the Craigs' position that BSD should not have restrained or separated A to be illogical and unreasonable.  When one student's behavior becomes excessively disruptive to the education of other students, the school should not be expected to stand idly by.  Doing so would deny other students of their education.  Here a student's behavior presented a threat to the safety of himself and others.  It is reasonable that BSD restrained A to keep himself, other students, and BSD staff safe.  BSD's use to physical force, restraint, and seclusion did not amount to a denial of FAPE under the IDEA.

      **iii.**    **The Craigs' Allegation that BSD Did Not Address the Lack of Academic Progress or the Increasing Severity, Frequency, and Intensity of A's Disability Related Behaviors.  (Doc. 162, p. 6).**

BSD did not deny A a FAPE by failing to address A's lack of academic progress or increasing behavior issues. As mentioned above, BSD held programming conferences and IEP meetings on June 1, 2012 (Hearing Officer's Final Decision and Order, p. 5), October 29, 2012 (*Id.*, p. 7), December 5, 2012 (*Id.*), March 8, 2013 (*Id.*, p. 10), May 30, 2013 (*Id.*, p. 11), June 10, 2013 (*Id.*, p. 13), and August 9, 2013 (*Id.*, p. 14).  At these meetings BSD addressed the lack of

academic progress and the increasing severity, frequency, and intensity of A's disability related

behaviors.  A's parents were at all of these meetings.  The record is clear that BSD took many

steps and that the Craigs were involved along the way.  The Court does not see how this could

possibly amount to procedural or substantive violations of the IDEA.

> **iv.    The Craigs' Allegation that BSD Unilaterally Determined that A Did Not Need Positive Behavioral Supports or Strategies After Placing Him in the AU Classroom.  (Doc. 162, p. 10).**

BSD did not deny A a FAPE by failing to implement strategies or by its process of deciding

which interventions to use to best address A's behavior.  As mentioned in the immediately

preceding section, BSD held many programming conferences and IEP meetings.  A's parents were

present at all of these meetings.  A's parents were permitted to speak and share their opinions.  To

allege that BSD "unilaterally" determined which strategies to implement does not reflect the facts

in this case, and this alleged violation of the IDEA is completely without merit.

> **v.    The Craigs' Allegation that BSD Outlined Vague Goals and Objectives that were Not Tailored to A's Areas of Need.  (Doc. 162, p. 10).**

The Court concludes that A was not denied a FAPE on account of the specificity of the

goals and objectives defined by the IEP's developed for A.  Plaintiffs argue that BSD outlined

vague goals and objectives that resulted in the denial of FAPE.  (Doc. 10).[11]  IEP goals can be "so

vague and general as to fail to demonstrate that the IEP was reasonably calculated to result in

educational benefit."  *Indep. Sch. Dist. No. 701, Hibbing Pub. Sch., Hibbing, Minn. v. J.T. ex rel.*

*C.L.*, 2006 WL 517648, at \*7 (D. Minn. Feb. 28, 2006).  In *Hibbing*, a school stated only two

goals.  First "[the Student] will increase the ability to express anger and frustration in socially

---

[11]  The Craigs support this assertion with cases that they cite only as appearing in *Individuals with Disabilities Education Law Report* (IDELR), LRP Publications, Horsham, PA, which is not an authoritative source.

acceptable ways from arguing, confronting, and refusing to work to calmly discussing solutions to problems with others."  Second, "[the Student] will improve his functional academic skills from a level of not completing assignments independently to a level of being able to read, write and do basic math skills independently." (*Id*.).

The Court has carefully reviewed all of A's IEPs and IEP related documents.  (District's Hearing Exhibits (Tabbed), 1E, 1F, 1G, 1H, 1I, 1J, 1K, 1L, 1M, and 1N)  For example, examining the IEP from May 30, 2013 reveals the following six goals:

> 1. By the end of the 2013-2014 school year, with support of his teacher's, [sic] [A] will increase his ability to regulate his arousal level in order to participate in and complete school activities as evidenced by following his sensory program on 5 separate school days with no adverse reactions; as monitored by teacher and therapist data tracking.
>
> 2. [A] will display and explain appropriate verbal and non-verbal social interaction skills when provided with appropriate activities and materials as measured by 80% accuracy.
>
> 3. [A] will display and explain appropriate verbal and non-verbal social interaction skills when provided with appropriate activities and materials as measured by 80% accuracy.
>
> 4. When given stories, [A] will apply grade-level phonics and decoding skills to read fluency as measured with 80% accuracy by the end of the school year.
>
> 5. When given a writing prompt, [A] will write grade level sentences using correct capitalization, punctuation, and spelling as measured by 80% accuracy by the end of the school year.
>
> 6. When presented with choices related to personal behavior, [A] will demonstrate improved social/behavioral skills by choosing the appropriate behavior on 6 of 8 opportunities by the end of the school year.

(District's Hearing Exhibits (Tabbed), 1L).  Even taking these goals at face value, they are barely comparable to those quoted above from *Hibbing*.  2006 WL 517648, at *7.  But the May 30, 2013 IEP goes much further than merely defining these goals.  For five of those six goals, the IEP provides between two and four benchmarks. (District's Hearing Exhibits (Tabbed), 1L).

Additionally the IEP outlines what type of evaluation will be used in measuring each goal, provides data stating when the evaluations were conducted, provides detailed information about the source of the data, identifies which student standard the goal relates to, provides a narrative impact statement, and outlines strengths and needs.  (*Id.*).  To argue that this IEP compares to the one in *Hibbing* and is "so vague and general as to fail to demonstrate that the IEP was reasonably calculated to result in educational benefit" is a borderline frivolous argument.  The Court rejects this argument and finds that the IEPs created by BSD did not deny A a FAPE under the IDEA.

### vi.   The Craigs' Allegation that BSD Failed to Provide Evidence that A's Goals and Objectives Were Being Implemented.  (Doc. 162, p. 10).

The Court concludes that BSD did not fail to provide A a FAPE due to the implementation of the defined goals.  BSD convened A's IEP team for many meetings, all of which sought to review the implementation of the goals and objectives defined in the multiple IEPs.  The Court reviewed A's IEPs and IEP related documents.  (District's Hearing Exhibits (Tabbed), 1E, 1F, 1G, 1H, 1I, 1J, 1K, 1L, 1M, and 1N).  The IEPs contain statements about accommodations necessary to measure achievement, a statement about present levels of academic performance, the date on which services outlined in the IEP would commence, progress indications, an explanation of the extent to which A would be in special education classes versus the general education supported by specific allocation of minutes to be spent in each setting, and a statement of educational and related services being provided to A.  Furthermore, the IEPs outlined A's progress toward his goals.  The Court concludes that BSD implemented A's IEPs and documented its implementation in a way did not violate the IDEA.

> **vii.    The Craigs' Allegation that BSD Used a Variety of Unorthodox and Potentially Harmful Strategies that Were Not Contained in a Behavior Plan.  (Doc. 162, p. 11).**

The strategies of restraint and confinement used by BSD do not rise to the level of an IDEA violation as applied here.  *See* Section III.B.1.b.ii above.  Those tactics did not violate the IDEA.  Over the course of the several programming conferences and IEP meetings held by BSD, A's parents were present and there is no evidence in the record to suggest that BSD refused to consider their suggestions.  To the contrary, there is evidence that BSD delayed making decisions when the parents expressed concerns.  (Hearing Officer's Final Decision and Order, p. 13) (noting that at the May 30, 2013 IEP meeting, A's "[p]arents expressed some concerns about [a placement change], and the discussion was tabled until June 10, 2013, when the IEP team would reconvene.").

Furthermore, the strategies used by BSD were in compliance with the IDEA.  This Court will not review every policy decision made by BSD.  *See* Section III.A.1.b.v above.  A court must ensure compliance with the IDEA, and educational decisions that are shown to be unreasonable are potentially subject to criticism or reversal.  But it is also clear that the IDEA is not a standard of perfection, and the IDEA "does not require states to make available the *best* possible option." *Grace*, 693 F.2d at 43.  Rather, the IDEA exists "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE] by such agencies."  20 U.S.C. § 1415; *B.S. ex rel. K.S. v. Anoka Hennepin Pub. Sch.*, 799 F.3d 1217, 1219 (8th Cir. 2015).

BSD held multiple meetings to address A's education at BSD and A's parents were in attendance at these meetings.  Decisions were made at those meetings regarding the strategies that were to be used.  Whether or not any of these strategies was the best available, no strategy implemented by BSD is deserving of reversal in this IDEA claim.  More importantly, BSD ensured

that the procedural safeguards required by the IDEA were in place.  The strategies used by BSD

did not amount to a violation of the IDEA.

> ### viii. The Craigs' Allegation that BSD Failed to Educate A in the Least Restrictive Environment.  (Doc. 162, p. 11).

BSD did not fail to educate A in the least restrictive environment.  *See* Section III.A.1.b.vi

above.  Pursuant to the IEP dated June 1, 2012, A was to receive 800 minutes of general education

and 1,300 minutes of special education per week.  (District's Hearing Exhibits (Tabbed), 1F).  On

May 30, 2013, an IEP meeting was held and it was determined that L would begin receiving 400

minutes of general education and 1,700 minutes of special education per week.  (District's Hearing

Exhibits (Tabbed), 1L).  Under these facts, the Craigs appear to be arguing that placing their child

in a general education setting for 800 or 400 minutes per week and in a special education setting

for 1,300 or 1,700 minutes per week amounts to a failure to educate their child in the least

restrictive environment.  *See* Section III.A.1.b.vi.

> ### ix. The Craigs' Allegation that BSD Predetermined the Placement of A in the AU Classroom Before He Ever Started Kindergarten Based on His Autism Diagnosis Prior to Conducting an IEP Meeting and Involving His Parents in the Placement Decision.  (Doc. 162, p. 14).

This allegation fails on its face to amount to an actionable IDEA violation in this lawsuit.

The scope of this IDEA review is defined by the very first sentence of the Hearing Officer's final

opinion, and the relevant time period is identified as "the 2012-2013 and 2013-2014 academic

years."  (Hearing Officer's Final Order and Opinion, p. 1).  On its face, this allegation relates to a

decision made by BSD before A entered kindergarten, which would have been a decision that took

place before the 2011-2012 school year.  But even construing this allegation broadly to stand for

the proposition that BSD failed to involve A's parents in making placement decisions, the

allegation still fails.  *See* Section III.A.1.b.vii.  The record indicates that at every decision in which

A's placement was changed, the Craigs were present.  There is evidence in the record that BSD was deferential to the Craigs' wishes.  (Hearing Officer's Final Decision and Order, p. 13) (noting that at the May 30, 2013 IEP meeting, "[p]arents expressed some concerns about [a placement chage], and the discussion was tabled until June 10, 2013, when the IEP team would reconvene."). Whatever preference BSD began this process with, it did not make a final decision regarding A's placement until after the meeting that took A's parents' opinions into account.  Whether the placement decisions are exactly what A's parents would have wanted, or what A's parents would like them to have been now with the benefit of being informed by hindsight is irrelevant.  The IDEA requires that the parents were present and that the school did not predetermine the placement.  There is no indication that BSD refused to consider the Craigs' concerns, predetermined the placement of A prior to placement meetings, or compromised the cooperative process guaranteed by the IDEA.

### c.  Conclusion on IDEA Claim

After examining the parties' briefs, reviewing the entire administrative record, carefully reading the Hearing Officer's written opinion, and looking at the relevant case law the Court is unable to conclude that BSD's actions deprived A of a FAPE under the IDEA.  Therefore, BSD's motion for summary judgment on the Craigs' IDEA claim is granted.

### 2.  § 1983 Claim for Violation of Bodily Integrity

Summary judgment will be awarded in favor of BSD on the Craigs' claim for violation of bodily integrity.  Although the facts of the Craigs' claim differ from the Parrishes' claim as outlined in the IDEA review above, the construction of the claim for bodily integrity mirrors the Parrishes' so the Court's analysis also largely mirrors the pertinent analysis above.  *See* Section III.A.2.  The issue still pending is whether the Craigs can show that BSD violated A's Fourth

Amendment right to bodily integrity.  The Court concludes that they cannot, and thus summary judgment will be entered in favor of BSD on the § 1983 claim with regard to bodily integrity.

In *C.N.*, the Court found that physical restraint was not a substantial departure from accepted professional judgment in large part because such methods were proscribed in the child's IEP.  591 F.3d at 633.  Even where application of such methods was "overzealous at times and not recommended" this still did not amount to a substantial departure from accepted professional judgment.  *Id.*  Here A's IEPs specifically allowed for transporting and removing A.  (District's Hearing Exhibits (Tabbed), 1H, 1J).  The Craigs counter that transporting and removing A is distinguishable from restraining A.  (Doc. 163, ¶ 4).  Much of the Craigs' argument (Doc. 162, pp. 20-22) and submission of supplemental filings in support of their position about the use of force (Docs. 169, 170) seem to be an assertion that force was not proscribed in A's IEP and that force has no—or at least a very limited—place in the education of children.  There is no authority cited that states that restraint should never be used in an educational setting.  In fact, Plaintiffs' own supplemental filing in support of its opposition to summary judgment states in part that "[p]hysical restraint or seclusion should not be used except in situations where the child's behavior poses imminent danger of serious physical harm to self or others and restraint and seclusion should be avoided to the greatest extent possible without endangering the safety of students and staff." (Doc. 169-1, p.2).  The evidence cited above shows that A's behavior posed an imminent threat to staff and other students.  This, combined with the fact that some level of force was proscribed by A's IEP, supports the finding that physical restraint was reasonable under the circumstances and not contrary to the Fourth Amendment.

### 3.    Equal Protection Claim

Summary judgment will be awarded in favor of BSD on the Craig claim of an equal protection violation.   As with the Fourth Amendment claim, the Craigs' equal protection claim mirrors the Parrishes' so the Court's analysis also mirrors the pertinent analysis above and subjects BSD's decision to rational basis review.   *See* Section III.A.3.   BSD urges the Court to grant summary judgment because it claims that the Craigs cannot meet their burden to show that A received disparate treatment from similarly situated persons.  (Doc. 144, p. 6).   BSD states that ensuring the safety of staff and students is a legitimate government purpose.   (*Id.*, p. 7). Furthermore, it argues that the Craigs cannot identify comparators.  (*Id.*).   In response, the Craigs do not offer any comparator and do not explain why BSD's stated reason is not legitimate. The Craigs fail to address the controlling case law cited by BSD and instead, without citation, argue that BSD has the burden because they assert that BSD "has produced no evidence that children with disabilities who did not have an autism diagnosis were physically restrained, secluded, and subjected to physical abuse like the Plaintiffs' children."  (Doc. 162, pp. 22-23).   Because the Craigs failed to meet their burden to show that BSD's actions cannot survive rational basis review, and because the Craigs have not identified similarly situated students, their equal protection claim fails and summary judgment will be entered in favor of BSD.

### 4.    § 504 of the Rehabilitation Act Claim and ADA Claim

Summary judgment on the Craigs' § 504 and ADA claims will be granted in favor of BSD. As with the Fourth Amendment and the Equal Protection claims, the Craigs' § 504 and ADA claims mirror the Parrishes' so the Court's analysis also mirrors the pertinent analysis above.  *See* Section III.A.4.  As proof that BSD acted with the requisite mental state, Plaintiffs allege that A was targeted for physical restraint, seclusion, physical abuse, and was denied needed supports,

services, and accommodations.  (Doc. 162, p. 17 (*citing* Doc. 85-1, Doc. 85-2)).  As described in Section III.B.1.b.ii above, after a thorough review of the IDEA record it is very clear why BSD touched A at times while he was enrolled at BSD.  BSD acted in compliance with ADE regulations, and not in violation of the IDEA.  Furthermore, many of the incidents that resulted in BSD physically restraining A came about because A was engaging in acts of physical aggression that presented an imminent danger to himself, staff members, and other students.  There is no evidence in the expansive record to show that BSD acted in bad faith or with gross misjudgment in its decisions to transport and restrain A.

There are many other allegations raised in the Plaintiffs' motion that conceivably might form the basis for theories of a § 504 or ADA violation, but there is not adequate proof of intent.  (Doc. 162, pp. 16-19).  *See* Section III.A.4.  The Court has reviewed the Craigs' brief opposing BSD's motion for summary judgment, looking for any additional evidence of the bad faith or gross misjudgment required for a § 504/ADA claim.  Having found none, summary judgment will be granted in favor of BSD on the Craigs' § 504 and ADA claims against BSD.

### C.    BSD's Motion for Summary Judgment on All Claims Asserted by the Siverly Plaintiffs.  (Doc. 128).

#### 1.    Background

Rachelle Siverly brings this claim against BSD arising from the time that her child S was enrolled in school at BSD.  (Doc. 129, ¶ 1; Doc. 166, ¶ 1).  S was in the second grade at Sugar Creek Elementary School during the 2012-2013 school year.  (Doc. 129, ¶ 1; Doc. 166, ¶ 1).  S is a student who has been diagnosed with autism.  (Doc. 129, ¶ 2; Doc. 166, ¶ 2).  Because of S's diagnosis, BSD educated S in accordance with an IEP that was developed under the procedures outlined in the IDEA.  (Doc. 129, ¶ 2; Doc. 166, ¶ 2).  Although there is an irrelevant disagreement

between the parties about whether the IDEA procedures were followed,[12] there is evidence in the record that Ms. Siverly participated with BSD employees in the development of an IEP for S. (Doc. 129, ¶ 3; Doc. 166, ¶ 3).  During the course of educating S according to an IEP, BSD also relied upon Behavior Plan Documents, input from a psychologist, and a crisis plan.  (Doc. 129, ¶¶ 4-6, 23-25; Doc. 166, ¶¶ 4-6, 23-25).

IEP documentation from April 25, 2013 indicates that S refused to do work and follow directions.  (Doc. 128-1, p. 10).  The documentation states that "[w]hen he was receiving instruction in the special education classroom, this work refusal escalated to physical aggression at least once per day, and [S] would spend an average of one hour per half-day in the recovery setting, for deescalation."  (*Id*.).  A behavior support plan dated from August 21, 2012 to September 28, 2012 indicates that in that approximately one month period alone, S exhibited 28 episodes of physical aggression, 16 episodes of verbal aggression, 27 episodes of refusing to work, and 21 episodes of attempting to leave, for a total of 92 episodes of behavioral issues.  (Doc. 128-2, p. 10).  As an example of what S's behavioral issues included, documentation shows that S would throw chairs, flip over equipment, run up and down the aisle of the school bus, throw objects in the classroom, and kick, punch, scratch, and head-butt staff members.  (Doc. 128-2, p. 2).

In dealing with this misbehavior, S's student crisis plan notes that an objective was to "[r]educe [S]'s incidents of physical aggression towards peers and adults."  (Doc. 128-2, p. 6). This student crisis plan explicitly authorized BSD to "use physical restraint as a last resort when the individual presents a danger to self and others."  (*Id*., p. 11).  In addressing S's misbehavior

---

[12] Because the Siverlys did not exhaust their administrative remedies, any dispute over BSD's compliance with the IDEA is not something that can be resolved in this lawsuit.  However, the facts surrounding BSD's compliance with the IDEA are relevant to the extent that they provide a factual basis for assessing the remaining claims.

and acts of physical aggression, BSD restrained S and placed S in a deescalation room.  (Doc. 129, ¶ 6; Doc. 166, ¶ 6).  BSD used various methods of restraint for S.[13]

### 2.    Scope of Ms. Siverly's Lawsuit, Administrative Exhaustion

Section 1415(*l*) of the IDEA provides that if a suit brought under another law "seek[s] relief that is also available under" the IDEA, a plaintiff must first exhaust the IDEA's administrative procedures.  20 U.S.C. § 1415.  The Court addressed this requirement of administrative exhaustion in a previous order, and limited the scope of Ms. Siverly's claims as follows:

> [C]laims by the Laws and Ms. Siverly may survive the motion to dismiss to the extent that they seek redress for non-educational injuries unrelated to the provision of a [FAPE] as defined by the IDEA. Claims by the Laws or Ms. Siverly that seek redress for educational harms, however, are subject to dismissal.

(Doc. 91, p. 10).  BSD now argues that the Siverlys' remaining claims are premised solely on educational injuries, and as such are barred for failure to exhaust their administrative remedies. (Doc. 130, p. 6).  Ms. Siverly responded by arguing that the compensatory and punitive damages that she seeks are not available under the IDEA, thus taking her claims outside of the IDEA's exhaustion requirement.  (Doc. 165, p. 16).  Further, she argues for a broader categorical analysis, urging the Court to find that "allegations of physical and mental abuse fall outside of general disciplinary and pedagogical practices as well as outside of the scope of the IDEA and its administrative procedures," and that as such the IDEA's exhaustion requirement does not apply.

---

[13] Plaintiffs' expert takes issue with the methods used to restrain S, and asserts that they run contrary to the accepted practices in schools.  (Doc. 166, ¶ 6; Doc. 165-6).  A challenge to BSD's choice in policy is best addressed in an IDEA proceeding with the ADE.  In this case, there is no such proceeding for the Court to review, so the Court will not engage in scrutinizing BSD's policy choices.  This is argument that will have some limited level of relevancy below for the limited purpose of deciding whether BSD's actions were a departure from accepted practices that rose to the level of a violation of § 504 or the ADA.  However, as an educational policy matter this argument is irrelevant.

(*Id.*, pp. 17-18).  Finally, even if the IDEA exhaustion requirement does apply, Ms. Siverly argues for application of a judicially recognized exception.  (*Id.*, p. 19).

The Court must address the issue raised in its previous order of whether the remaining claims seek redress for educational harm, because if they do, then as per the Court's previous order they are precluded for failing to exhaust the administrative remedies.  (Doc. 91, p. 10).  In addressing this question, the Court slightly revises its inquiry in light of intervening Supreme Court precedent.  *Fry v. Napoleon Cmty. Sch.*, No. 15-497, 2017 WL 685533, 580 U.S. ___ (2017).  The question of exhaustion "hinges on whether a lawsuit seeks relief for the denial of a [FAPE]. If a lawsuit charges such a denial, the plaintiff cannot escape § 1415(*l*) merely by bringing her suit under a statute other than the IDEA." *Id.*, at *10.  "[I]n determining whether a suit indeed 'seeks' relief for such a denial, a court should look to the substance, or gravamen, of the plaintiff's complaint." *Id.*, at *8.  "A court deciding whether § 1415(*l*) applies must therefore examine whether a plaintiff's complaint—the principal instrument by which she describes her case—seeks relief for the denial of an appropriate education." *Id.*, at *10.  In defining the gravamen of a plaintiff's complaint, a court "should consider substance, not surface." *Id.*, at *11.  There are no magic words, and the labels assigned by a plaintiff are not determinative.  *Id.*  A court must make a meaningful inquiry, as "Section 1415(*l*) is not merely a pleading hurdle." *Id.*  The Supreme Court provided some guidance to a district court making this determination:

> One clue to whether the gravamen of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination, can come from asking a pair of hypothetical questions. First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library? And second, could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance?

*Id.*, at \*12.  Additionally, the Court provided:

> A further sign that the gravamen of a suit is the denial of a FAPE can emerge from the history of the proceedings. In particular, a court may consider that a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute—thus starting to exhaust the Act's remedies before switching midstream.

*Id.*, at \*13.  In *Fry*, the Supreme Court rejected the Sixth Circuit's surface level inquiry of asking whether the injuries alleged were "educational" in nature, instead requiring a more in depth inquiry.  *Id.*  This inquiry is slightly more nuanced than the approach that had previously been followed in the Eighth Circuit, where courts would look to see whether the plaintiffs had asserted a "claim that is wholly unrelated to the IEP process."  *M.P. ex rel. K. & D.P. v. Indep. Sch. Dist. No. 721, New Prague, Minn.*, 439 F.3d 865, 868 (8th Cir. 2006).  *Fry* does not require an ADA or § 504 claim to be "wholly unrelated to the IEP process," but rather involves defining the gravamen of the complaint.

The Court determines that even though *Fry* is not directly on point, it is helpful, and its analysis will be followed where it applies.  *Fry* addressed the scope of administrative exhaustion where plaintiffs sought declaratory relief and compensatory damages (remedies not available under the IDEA) and expressly said that their complaint was not about the denial of FAPE (thus making the claim not premised on the IDEA).  *Fry*, at \*7 and n.4.  *Fry* explicitly left open the issue of whether exhaustion is required "when the plaintiff complains of the denial of a FAPE, but the specific remedy she requests … is not one that an IDEA hearing officer may award."  *Id.*, at n.4.  The issue here is actually different than that confronted in *Fry* and that which *Fry* explicitly declined to address: when a plaintiff seeks relief that may be awarded by a hearing officer under the IDEA and relief that may *not* be, and when the complaint facially purports to seek this relief

based on the denial of FAPE and *not* based on the denial of FAPE, must a plaintiff first exhaust the administrative remedies available under Section 1415(*l*).[14]

Ms. Siverly's case is indeed quite different than the narrower case of *Fry*.[15] Ms. Siverly seeks compensatory damages, preliminary and permanent injunctive relief, attorney's fees, punitive damages, and "other and further relief as this Court deems just and proper." (Doc. 46, pp. 63-65). Damages are not an available remedy under the IDEA as remedies under the IDEA are injunctive in nature. *Birmingham v. Omaha Sch. Dist.,* 220 F.3d 850, 856 (8th Cir. 2000) (noting that compensatory education is an available remedy under the IDEA); *Heidemann v. Rother,* 84 F.3d 1021, 1033 (8th Cir. 1996); *Miener v. State of Mo.*, 673 F.2d 969 (8th Cir. 1982); 165 A.L.R. Fed. 463. Attorney's fees are available under the IDEA. 20 U.S.C. § 1415(i)(3)(B). Because Ms. Siverly generally seeks injunctive relief against BSD, Ms. Siverly in part seeks remedies available under the IDEA. But seeking remedies available under the IDEA and seeking relief available under the IDEA are separate issues. *McCauley v. Francis Howell Sch. Dist.*, 16-1756 (8th Cir. Mar. 7, 2017) (applying *Fry* and making it clear that seeking relief available under the IDEA means seeking relief for the denial of a FAPE). Furthermore, merely tacking on a request for damages or some other remedy not available under the IDEA will not avoid the Section 1415(*l*) exhaustion requirement. *Id.*, p. 8 (collecting cases).

---

[14] This is what the Plaintiff's complaint alleges on its face. Since there is one complaint that initiates a lawsuit on behalf of four different sets of facts for four different plaintiffs, it is possible that in the case of Ms. Siverly, Plaintiffs' counsel actually intended to seek something narrower. But the Court will not infer, or narrow the complaint for Plaintiffs, as they are the ones that chose to engage in this "kitchen-sink" litigation. *See infra* note 15.

[15] The complaint (Doc. 46) takes a "kitchen-sink" approach to litigation, heaping on plaintiffs, defendants, causes of action, and remedies sought. This approach is typically discouraged. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2308 (2016), *as revised* (June 27, 2016) (cautioning that "kitchen-sink" litigation is an approach that "is less than optimal—not only for litigants, but for courts.").

Ms. Siverly has asserted claims under the following theories that the Court has broken into two groups for ease of untangling the Plaintiffs' complaint. In Group One, the Court is considering the following allegations: S was denied an appropriate IEP (Doc. 46, ¶ 21), Ms. Siverly was denied meaningful participation in the education of her child (*Id.*, ¶ 22), Ms. Siverly was denied timely progress reports (*Id.*), Ms. Siverly was denied documentation on disciplinary removals and the use of force (*Id.*), Ms. Siverly was denied meaningful access to educational records (*Id.*), S was denied research based behavioral interventions to address his deficits (*Id.*), BSD failed to provide special education services in the least restrictive environment (*Id.*, ¶ 48), BSD failed to provide parents meaningful participation in IEP meetings (*Id.*), BSD failed to allow S to have a regular recess (*Id.*, ¶ 141), BSD made S sit at a special table during lunch (*Id.*), BSD denied S from using the library and checking out books (*Id.*), BSD failed to assign S homework (*Id.*), BSD made S earn the right to attend field trips (*Id.*), BSD did not put S's picture in the yearbook (*Id.*), BSD failed to allow S to attend the same assemblies as other students (*Id.*), and BSD failed to allow S to walk out with other students at the end of the school day (*Id.*). In Group Two, the Court is considering the following allegations: BSD denied S the representation of an advocate by authorizing BSD's counsel to send S's chosen advocate a cease and desist letter stating that BSD might sue the advocate for defamation and harassment based on her actions (*Id.*, ¶ 145), BSD segregated S solely based on his diagnosis of autism (*Id.*, ¶ 48), BSD entered into a conspiracy with the juvenile judge by filing a FINS petition to circumvent the IDEA (*Id.*, ¶ 85), BSD reported S as truant from school so as to circumvent the IDEA (*Id*., ¶ 86), and BSD restrained and secluded S (*Id.*, ¶¶ 102, 148).

All of the allegations that are in Group One form the basis for a lawsuit the gravamen of which seeks to redress the denial of a FAPE. The proper way to address the allegations in Group One is by first pursuing an IDEA due process hearing with the ADE, and failure to exhaust this

remedy bars the Plaintiff from asserting these claims here.  In reaching this conclusion, the Court has looked at all three clues provided.  First, the Plaintiff could not have brought essentially the same claims alleged in Group One if the alleged conduct had occurred at a public facility that was not a school such as a public theater or a library.  Those theories stem from the obligations of a school in educating a child.  Second, an adult at the school such as an employee or visitor could not have pressed essentially the same grievances as those alleged in Group One.  And third, the Plaintiff previously sought an administrative hearing at the ADE but did not pursue those proceedings to their completion.  All three of these clues from *Fry* support a finding that Ms. Siverly seeks redress for the denial of FAPE on the basis of her Group One allegations, and claims based on these allegations are subject to Section 1415(*l*) preclusion.

The Group Two allegations have the potential to be the gravamen of a lawsuit that seeks relief for something other than the denial of FAPE.  With regard to the Plaintiff's claim that BSD segregated S, the Court notes that segregation is not something subject to preclusion under Section 1415(*l*).  However, here the Plaintiff's use of the word "segregate" is misplaced.  It is true that BSD placed S in the AU classroom, but that was a decision made in IEP meetings at which Ms. Siverly was present.  Furthermore, educating students with special needs in a classroom separate from other students is not segregation as Plaintiff contends, and rather is more akin to meeting the needs of different students in different settings.  The essence of this allegation is the denial of FAPE through a placement decision made by BSD and Ms. Siverly was required to exhaust administrative remedies before seeking relief for claims arising out of this allegation.

With regard to Ms. Siverly's allegation that BSD denied S the representation of an advocate by authorizing BSD's counsel to send S's chosen advocate a cease and desist letter stating that BSD might sue the advocate for defamation and harassment based on her actions, this claim has

not been supported by evidence.  BSD's counsel is not a party to this lawsuit, and while Mr. Ney may have been acting as BSD's agent at that time, there is simply insufficient evidence to justify further analysis of this point.  Whether S's advocate committed defamation or harassment, and whether BSD's counsel did something coercive in silencing that advocate is an issue the Court declines to address.

With regard to Ms. Siverly's allegation that BSD wanted S to be placed at Vista Therapeutic Day Treatment (TDT) but that she refused, (Doc. 46, ¶¶ 76, 85), Ms. Siverly alleged wrongdoing by BSD because it "contacted the Benton County Juvenile Court authorities and executed a FINS petition requesting the Juvenile Judge order the parent to place S at TDT."  (*Id.*, ¶ 85).  That is, Ms. Siverly is alleging that BSD entered into a conspiracy with the juvenile court to change S's placement by court order, thus circumventing the procedures outlined for a placement change in the IDEA.  While it is hypothetically possible that a school district could enter into a conspiracy with juvenile court authorities to change a student's placement, for a lawsuit to be premised on such a conspiracy there would need to be proof of its existence.  The fact that a school district contacts juvenile court authorities to request that a FINS petition be filed is not alone proof of such a conspiracy.  *Lewis v. Clarksville Sch. Dist.*, No. 4:13CV00212, 2016 WL 1588110, at *8 (E.D. Ark. 2016).  Under some situations, schools in Arkansas are required to contact authorities.  *See e.g.*, Ark. Code Ann. § 6-18-222 (2016).  Furthermore, a state court judge is an independent actor, and even if a school district directly requested that the juvenile judge order a placement change for a child, this alone would be insufficient proof of a conspiracy.  After carefully reviewing this case, the Court finds that the record is completely void of any evidence that would support this alleged conspiracy theory.  The Court declines to further analyze this

62

allegation by Ms. Siverly because there is no evidence to support it.  Whether exhaustion is required is therefore immaterial.

Ms. Siverly also alleges that BSD circumvented the IDEA by "notifying the juvenile court that S was truant from school and should be ordered to attend TDT."  (Doc. 46, ¶ 86).  Schools in Arkansas have a duty to ensure that attendance of students is accounted for and that excessive absences are dealt with by involving authorities.  Ark. Code Ann. § 6-18-222(a)(5)(A) (2016) (requiring that "[w]hen a student exceeds the number of unexcused absences provided for … the school district … shall notify the prosecuting authority … and the student's parent, guardian, or person in loco parentis shall be subject to a civil penalty through a family in need of services action in circuit court.").  Since Ms. Siverly's argument here alleges that BSD's compliance with a statutory duty is the basis for liability, the Court regards this argument as untenable and borderline frivolous.  The Court will not further analyze this claim, and whether exhaustion is required is immaterial.

Finally, Ms. Siverly's claims that BSD restrained and secluded S are precluded by Section 1415(*l*), although this is not apparent solely from the *Fry* analysis.  First, the Plaintiff could have brought essentially the same claim had the conduct occurred at a public facility that was not a school such as a public theater or a library.  Second, an adult at the school such as an employee or visitor could have pressed essentially the same grievances for restraint or seclusion as those alleged here.  And third, the Plaintiff previously did seek an administrative hearing at the ADE but did not pursue those proceedings to completion.  Clues one and two point to no preclusion, and clue three points to preclusion.  Because a *Fry* analysis does not clearly demonstrate preclusion is or is not appropriate, the Court has relied heavily on *McCauley v. Francis Howell School District*.  No. 16-1756 (8th Cir. Mar. 7, 2017) (slip opinion).

In *McCauley*, the Eighth Circuit applied *Fry* to determine that a district court had not erred in concluding that a complaint sought relief for the denial of a FAPE under the IDEA. *Id.*, at p. 6. The complaint alleged that the student "was entitled to the educational services and protections available under the [IDEA]," that he was "entitled to reasonable accommodations for his disabilities," that the student was "placed in physical restraints," and that the student "was denied … because of his disability, participation in and the benefits of a public education." *Id.* The Eighth Circuit concluded that this complaint was "based on how the use of isolation and physical restraints failed to provide proper sufficient supportive services to permit [the student] to benefit from . . . instruction, and ultimately denied [the student] . . . the benefits of public education." *Id.* (quotations and citations omitted). This conclusion was also supported by the finding that the plaintiffs were alleging that the district used restraint and isolation as disciplinary tools. *Id.*, at p. 7. Noting that the lawsuit was essentially premised upon the district failing to implement an IEP and instead using restraint and isolation as disciplinary measures, the Eighth Circuit concluded that the plaintiff's § 1983, Equal Protection, ADA and § 504 of the Rehabilitation Act claims were all precluded under Section 1415(*l*).

In alleging that BSD used restraint and seclusion inappropriately, Ms. Siverly cited to a publication by the U.S. Department of Education on the role of restraint and seclusion in managing behavior. (Doc. 46, ¶ 31). The Plaintiffs generally alleged that BSD failed to "stop the the [sic] use of physical restraints and seclusions with their children and address those behaviors through appropriate supports and programming." (*Id.*, ¶ 48). Ms. Siverly alleged that BSD failed to use the functional behavioral analysis that she provided to the school with regard to "research and evidence based interventions to appropriately educate S." (*Id.*, ¶ 79). Ms. Siverly then alleged that the reasons given by BSD for the physical restraint "ranged from simple non compliance to

physical aggression." (*Id.*, ¶ 80). The complaint also contains many statements like "[S was] denied an appropriate [IEP] to address [his] needs in the Least Restrictive Environment and instead [was] segregated away from peers." (*Id.*, ¶ 21). The Court concludes that the gravamen of Ms. Siverly's claims based on seclusion and restraint seek redress for the denial of FAPE since it is clear—even from the face of the Plaintiffs' complaint—that BSD used restraint and seclusion as responses to misbehavior in the school. Therefore, this theory of the lawsuit is also precluded under Section 1415(*l*).

Lastly, the Court addresses Ms. Siverly's argument that pursuing an IDEA due process hearing would have been "futile because by the time the Hearing Officer finally commenced the Plaintiffs' hearings, they had already moved out of state and the Hearing Officer lacked authority to fashion the relief requested." (Doc. 165, pp. 19-20). "Courts recognize only three exceptions to the exhaustion requirement, including futility, inability of the administrative remedies to provide adequate relief, and the establishment of an agency policy or practice of general applicability that is contrary to law." *J.B. ex rel. Bailey v. Avilla R-XIII Sch. Dist.*, 721 F.3d 588, 594 (8th Cir. 2013) (*quoting Blackmon ex rel. Blackmon v. Springfield R–XII Sch. Dist.,* 198 F.3d 648, 656 (8th Cir. 1999)). Ms. Siverly seems to mix the first and second exceptions together into one, but even though she used the word "futile" she seems to be invoking the second exception because she says that the Hearing Officer could not provide the relief requested. Because some of the relief that Ms. Siverly seeks is available under the IDEA,[16] the inadequate remedy exception to the exhaustion requirement does not apply. *J.B. ex rel. Bailey*, 721 F.3d at 595. Because Ms. Siverly was required to exhaust her administrative remedies before bringing her claims and because she did not do so, judgment against her is appropriate.

---

[16] *Supra* note 14 and accompanying text.

D.    **BSD's Motion for Summary Judgment on All Claims Asserted by the Laws Plaintiffs.  (Doc. 132).**

The scope of the Laws' lawsuit and the extent that it is barred for failure to exhaust administrative remedies mirrors the analysis of Ms. Siverly's claims in Section III.C.2 above, except that the Lawses have not asserted the conspiracy theory nor the FINS for truancy theory. Additionally, the Lawses concede that "G was not physically restrained or secluded that the Laws are aware of."  (Doc. 165, p. 6); (*see also* Doc. 46, ¶¶ 73, 74).  The only potentially conceivable claims by the Lawes are thus premised on an event that the Lawses conceded did not occur. Nonetheless, for the reasons stated above in Section III.C.2, the Laws' claims are precluded by Section 1415(*l*).

E.    **Cross Motions for Summary Judgment on the Plaintiffs' Claims Against the ADE. (Docs. 125, 139).**

1.    **Standard for Review of Cross Motions for Summary Judgment**

The same standard described in Section II applies where, as here, the parties file cross motions for summary judgment.  When the parties agree that there exists no genuine issue as to any material fact, "summary judgment is a useful tool whereby needless trials may be avoided, and it should not be withheld in an appropriate case."  *United States v. Porter*, 581 F.2d 698, 703 (8th Cir. 1978).  Each motion should be reviewed in its own right, with each side "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983).  "[W]here conflicting inferences as to a material fact may reasonably be drawn from the materials before the court, the case is not appropriate for summary judgment." *Id.*

"A party cannot defeat a summary judgment motion by asserting the mere existence of some alleged factual dispute between the parties; the party must assert that there is a genuine issue

of material fact." *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 751 (8th Cir. 2011) (internal quotation omitted).  "In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit." *Id.*

### 2.      Scope of the Remaining Claims Against the ADE

The only remaining claims against the ADE for the Court to rule on are the IDEA claims asserted by the Parrishes and the Craigs resulting from alleged procedural deficiencies.  Ms. Siverly and the Lawses never pursued due process hearings with the ADE so they have no recourse against the ADE for any claim stemming from the IDEA.  The Court previously ruled that "[c]laims by the Laws and Ms. Siverly survive[d] the motion to dismiss [Doc. 53] to the extent that they [sought] redress from the State Defendants for non-educational injuries unrelated to the provision of [FAPEs] as defined by the IDEA."  (Doc. 91, p. 11).  The Court concluded above that the Lawses and Ms. Siverly failed to exhaust their administrative remedies by availing themselves of the oversight provided by the ADE.  Because they did not avail themselves of that oversight, they can have no independent claims against the ADE.  Moreover, the Lawses and Ms. Siverly have failed to show that there are material issues of fact so as to survive a motion for summary judgment on their claims against the ADE.

The Parrishes and the Craigs assert that: the ADE violated their procedural due process rights (Doc. 46, ¶ ¶ 49, 119, 121-26, 128); failed to make findings of fact or conclusions of law (*Id.*, ¶ 52); generally failed to intervene in the BSD to ensure procedural compliance with the IDEA (*Id.*); specifically failed to ensure that BSD provided a FAPE to autistic students in the least restrictive environment (*Id.*); independently violated 42 U.S.C. § 1983 on many possible theories (*Id.*, ¶ 95) and also failed to address BSD's alleged Fourth Amendment violations (*Id.*, ¶¶ 102,

117, 127); independently violated § 504 of the Rehabilitation Act by failing to make reasonable modifications in policies, practices, and procedures (*Id.*, ¶ 137) and failed to correct BSD's alleged violations (*Id.*, ¶ 146); and independently violated the ADA by denying the necessary supports, services, and related services (*Id.*, ¶ 158) and by failing to ensure BSD's compliance with the ADA (*Id.*, ¶ 166).

The Court has already concluded that BSD did not violate the IDEA, § 504 of the Rehabilitation Act, the ADA or § 1983.  *Supra* Sections III.A, and III.B.  As such, to the extent that the Plaintiffs allege that the ADE violated these laws by failure to ensure that BSD was in compliance with each law, these claims must be rejected.  This still leaves the issue of independent violations of the underlying laws by the ADE separate and apart from BSD's actions.  The only interactions between the Parrishes' and the Craigs' and the ADE during which independent violations of the underlying statutes could have occurred were the due process hearings held by the ADE.  All of the Plaintiffs' other alleged independent violations by the ADE, to the extent that they have been alleged, fail to survive the ADE's motion for summary judgment because there is no dispute of material fact.

Specifically, there is no evidence in the record to suggest that the ADE acted with the intent necessary to sustain a § 504 or an ADA claim.  Plaintiffs have attempted to show this intent by citing to a plethora of alleged procedural violations and implying that those violations somehow all add up to showing intent.  But these alleged procedural violations during a due process hearing are actually allegations that the ADE did not comply with the IDEA, and the Court will treat them as such.  For the § 1983 claims, not only is it logically questionable to think that the lack of a policy by the ADE during a due process hearing could be characterized as an independent constitutional violation, but there is also authority suggesting that an alleged IDEA violation

cannot serve as the basis of a § 1983 action. *McNulty v. Bd. of Educ. of Calvert Cnty.*, 2004 WL 1554401 (D. Md. 2004). Thus, as noted above, to the extent that the alleged independent causes of action are premised on the theory that the ADE failed to hold fair hearings or have fair policies—which seems to be the majority of what the Plaintiffs allege—these allegations are best analyzed as an alleged failure by the ADE to adhere to the IDEA. Thus the Court concludes that the only remaining claims against the ADE for the Court to review in the sections below are the IDEA claims asserted by the Parrishes and the Craigs resulting from alleged procedural deficiencies.

### 3. The Parrishes' and Craigs' Allegations of Procedural Due Process Deficiencies that Rise to the Level of an IDEA Violation

The Plaintiffs have been unable to show any procedural due process violation by the ADE that amount to a violation of the IDEA. The Parrishes and Craigs have asserted five ways in which they allege that the ADE violated their due process rights in the hearings. First, Plaintiffs allege that Hearing Officer McCauley had a conflict of interest. Second, Plaintiffs allege a conflict of interest with Salas-Ford. Third, Plaintiffs point to many procedures that the ADE allegedly does not have but that Plaintiffs argue that it should have to ensure compliance with the IDEA. Fourth, Plaintiffs allege that the ADE failed to take action to ensure compliance with the timelines in place in the IDEA. And finally, Plaintiffs argue that the ADE denied them access to records so as to violate the IDEA. Having reviewed the record and the briefs submitted by the parties on their cross motions for summary judgment, the Court concludes that there is no material dispute of fact that would call into question whether the Craigs and the Parrishes received due process at their hearings.

The IDEA has some mandated policies and procedures, but the Court notes at the outset that in implementing the IDEA a state has a certain amount of autonomy.

> A party challenging whether a FAPE has been provided may file an administrative complaint, which entitles him to receive an impartial due process hearing before a local or state educational agency. *Id.* §§ 1415(b)(6), 1415(f). Federal regulations provide parents with the rights to (1) have the child who is the subject of the hearing present; (2) open the hearing to the public; and (3) have the record of the hearing and the findings of fact and decisions provided at no cost to parents. 34 C.F.R. § 300.512(c). Beyond these requirements, *the IDEA relies on the states to develop their own hearing procedures.*

*B.S. ex rel. K.S.*, 799 F.3d at 1219–20 (emphasis added).  Given that a state agency has some autonomy in developing its own procedures for conducting due process hearings, the Court will not look for uniformity in policies across states.  Rather a State Department of Education can be held liable for "failing to comply with its duty to assure that IDEA's substantive requirements are implemented." *John T. ex rel. Robert T. v. Iowa Dep't of Educ.*, 258 F.3d 860, 865 (8th Cir. 2001) (citations and quotations omitted).  "For example, [the Eighth Circuit] has suggested that 'systemic violation' of the State's responsibilities under the IDEA might give rise to state liability." *Pachl*, 453 F.3d at 1070 (*interpreting Reinholdson v. Minnesota,* 346 F.3d 847, 851 (8th Cir. 2003)).  The Court will now analyze all of Plaintiffs' alleged procedural due process violations.

### a.     Conflict of Interest with Hearing Officer McCauley

The Court cannot conclude that this alleged conflict with the Hearing Officer gave rise to a due process violation with regard to the Parrishes, and in the case of the Craigs any violation by the ADE was remedied by Plaintiffs counsel's litigation conduct.  Plaintiffs Parrish and Craig assert that their due process rights were violated by the alleged conflict of interest with Hearing Officer McCauley.  (Doc. 140, ¶¶ 8-11).  Specifically, on August 12, 2014, the day that the Craig hearing was to begin, Hearing Officer McCauley stated that his daughter had been hired by BSD.  (*Id.*, ¶ 8).  The ADE explained that the reason why this was disclosed on the day of the hearing is that McCauley's adult daughter had called him the night before to inform him of this development in her career.  (Doc. 155, pp. 4-5).  Therefore, any action taken by McCauley prior to August 13,

2014, could not present a conflict because prior to the evening of August 12, 2014, he didn't know about his daughter's employment with BSD.  Plaintiffs voluntarily dismissed both the Craig and Parrish actions on August 15, 2014.  (Doc. 127-12).  Therefore, the alleged conflict of interest could have only taken place on August 13, 14, and/or 15, 2014.

Clearly there was no due process violation with regard to the Parrishes.  Even though McCauley never presided over a due process hearing for the Parrishes, their theory for why there was a due process violation is "McCauley indicated that he intended to proceed with the rest of the Plaintiffs' due process hearings as soon as the Craig matter was concluded in spite of the personal conflict of interest he declared and in violation of ADE Reg § 10.01.24."  (Doc. 141, p. 8).  On its face, this represents a hypothetical future violation of due process because it describes actions that McCauley intended to take in the future but never actually took.  When Plaintiffs counsel's voluntarily dismissed the Parrishes' complaint thus cancelling the hearing scheduled with McCauley at a date in the future, they foreclosed the possibility that this hypothetical future violation of due process would ever take place.  Plaintiffs cannot rely on that hypothetical violation of due process as a completed action when their own litigation conduct ensured that it would not take place.[17]

---

[17] Plaintiffs assert that they "were forced to dismiss their complaint and refile to preserve the issue [of the conflict] for appeal." (Doc. 174, p. 4).  The Craig hearing commenced on August 13, 2014.  On the third day of the hearing, August 15, 2014, Plaintiff voluntarily dismissed the Craig case and the Parrish case.  If contesting the conflict of interest was truly the reason for dismissal, it seems strange that Plaintiff would litigate the case for three days and then dismiss it rather than dismissing it on the first day when the issue was first raised.  Further, there were definitely other ways for Plaintiffs to preserve the issue of the conflict for appeal, so it is not accurate that they were "forced to dismiss their complaint." Also, even if that were true for Craig, there is no way that they were forced to dismiss the Parrish complaint when it had not even yet begun.

When McCauley disclosed the conflict of interest in the Craig hearing, he further stated that his daughter was not in contact with anyone involved in the case and that he would not discuss the case with anyone. (*Id.*, p. 5). Absent either party providing an ADE regulation defining what a conflict of interest is for purposes of recusal in an ADE hearing,[18] and absent knowing more about the relationship between McCauley and his adult daughter, it is not entirely clear that this situation presented a conflict of interest, though there is at least the appearance of a conflict. Assuming that it was a conflict of interest for McCauley to conduct the Craig hearing, ADE Regulation § 10.01.24 states "[t]he hearing officer shall disqualify himself from presiding over any case in which he has a personal or professional interest and which might conflict with the hearing officer's objectivity in the hearing." Although the ADE Regulation might not be entirely on point, McCauley likely should have recused himself and his failure to do so would be problematic if he had completed the hearing and entered a final opinion and order in the matter. The fact that the ADE does not have procedures to address this situation and that Plaintiffs allege that the ADE has since failed to adopt procedures to address this situation increases the likelihood that a due process violation will occur in the future. However, counsel for Plaintiffs took two separate actions that remedied the alleged violation here.

First, when McCauley asked the parties about this potential conflict of interest, counsel for Plaintiffs stated "I don't have any problem." (Doc. 127-23, p. 1). Thus, to the extent that a

---

[18] Plaintiffs state that they cannot point to such definition because "[t]he ADE has not promulgated any judicial cannons [sic] or code of ethics for its hearing officers" who encounter a conflict in this situation as McCauley did. (Doc. 141, p. 9). While it certainly seems prudent that the ADE would do so, Plaintiffs have not cited to any authority stating that the ADE needs such a canon or code. Plaintiff further presents extensive argument on the ADE's policies, especially the changes that Plaintiffs think the ADE should have made since the start of this case. It is unclear how all of Plaintiffs's proposed changes to ADE policies that would have taken effect after the ADE handled these claims could affect the due process rights of Plaintiffs's claims here. Nonetheless, the Court acknowledges this argument but is unable to see how it is relevant.

perceived conflict can be waived, counsel waived it.  Second, if McCauley resolving the Craig case would have would have presented a due process violation based on the perceived conflict, counsel remedied the situation by voluntarily dismissing the Craig proceeding and refiling for a new action with the ADE.  (Doc. 155, p. 6).  McCauley never presided over an ADE proceeding that resulted in a final ruling, so there is no final judgment involving McCauley's perceived conflict.  The ADE conducted a subsequent hearing and made a final ruling that is not subject to this conflict challenge, and the Plaintiffs due process rights were protected.

### b.   Conflict of Interest with Salas-Ford

Based on the extremely limited evidence offered on this point, the Court cannot conclude that there was a due process violation with regard to the alleged conflict of interest with Salas-Ford.  Plaintiffs Parrish and Craig have alleged that there was a conflict of interest with Salas-Ford such that the ADE's failure to isolate her from their case resulted in a violation of their procedural due process rights.  (Doc. 141, p. 15).  Specifically, "Salas-Ford was the lead investigator on the ADE team that investigated the Parents' allegations of abuse … Salas-Ford selected which hearing officer was assigned to each due process case, and Salas-Ford ruled on behalf of the ADE in response to the Parent's Motion."  (*Id.*).  Other than noting that Salas-Ford did not testify at the hearing (Doc. 155, p. 11) the ADE does not address this argument.  Plaintiffs reiterate this argument in their reply.  (Doc. 174, pp. 5-6).  Yet it is unclear how this presents an alleged due process violation, and it has not been shown that this could have had any effect on the outcome of the ADE hearings.  There was no conflict of interest with the involvement of Salas-Ford.

### c.   Lack of ADE Procedures

The Court concludes that the ADE's procedures, or alleged procedural inadequacies, did not result in a due process violation.  Plaintiffs claim that the ADE policies deprived them of due

process because the ADE has no process or procedure regarding the assignment of the Hearing Officers. (Doc. 141, p. 11). The ADE responded by stating that the Hearing Officers are assigned in a rotation. (Doc. 155, p. 14). The Plaintiffs point to evidence that they argue suggests that the ADE's explanation of assignment by rotation is false and the ADE has no set rotation. The Plaintiffs highlight that the "only documentation received [in discovery on this issue] was a half page [sic] undated document that refers to a 'rotation.'" (Doc. 141, p. 11). Given the vague nature of this half-page document, Plaintiffs's counsel asked Salas-Ford—the person in charge of rotations at the ADE—to explain the half-page document and how the rotation process worked at the ADE. (Doc. 174, p. 6). Salas-Ford's response was "I can't. I don't recall." (*Id.*). Based on this evidence and the ADE's lack of argument submitted on this point, the most plausible explanation seems to be that the ADE does not assign its Hearing Officers in rotation.

Even assuming that the ADE does not assign Hearing Officers in rotation, the Plaintiffs have not shown that this has resulted in a due process violation such that summary judgment would be proper. Plaintiffs have also argued that "[t]he ADE has no process or procedure in place to address class action due process complaints." (Doc. 141, p. 3). All of Plaintiffs' allegations regarding these policies are asserted without supporting case law to support their conclusion that a due process violation occurred. Furthermore, Plaintiffs do not articulate how these allegedly flawed ADE policies resulted in a violation of their due process rights. Even if the facts are as Plaintiffs state, they have not shown that they are entitled to Judgment as a matter of law on the due process issue, and rather the record demonstrates that there was no due process violation regarding the assignment of Hearing Officers.

### d.    Timeline Issues

Plaintiffs allege that the ADE violated their due process rights by not ensuring timely hearings.  Plaintiffs cannot recover on this alleged theory because any potential due process violation that might have existed as a result of timeline delays was waived, and further enhanced by, Plaintiffs' counsel's litigation conduct.  Plaintiffs filed their original complaint with the ADE on March 26, 2014.  (Doc. 139-1, p. 25).  Plaintiffs assert that the 45-day window started running from that date.  Under the Plaintiffs' reading of this rule, the 45th day would have therefore been Saturday, May 10, 2014.  The next business day was Monday, May 12, 2014, so the Court considers that the deadline.  The ADE counters that "[t]he 45 day 'hearing period' was set to expire June 10, 2014."[19]  (Doc. 155, p. 16).  Regardless of which party, if either,[20] accurately stated this deadline, Plaintiffs requested an extension of time on May 9, 2014.  (Doc. 127-11, p. 1).  The actions of Plaintiffs' counsel, before the 45-day deadline ran, were the actual cause of the deadline not being met, and thus Plaintiffs cannot now use this initial failure to meet this deadline to support their argument that the ADE denied them due process by failing to meet the deadline.

Furthermore, the conduct of Plaintiffs' counsel resulted in additional delays.  For example, in light of the perceived conflict with Hearing Officer McCauley in the Parrish case, Plaintiffs' counsel voluntarily dismissed the case and refiled it.  That dismissal and refiling undoubtedly extended the timeframe of the case.  The Court will not chronical all of the litigation conduct here

---

[19] The ADE is not clear about whether the real date at issue is June 10, 2014.  This date is asserted without explanation, and for support is the citation "(DE 122)."  Docket entry 122 contains 42 pages, but a reference to June 10, or a calculation of how that date was arrived at, is not contained on any one of those 42 pages.  At another point in the same document, that ADE states that the deadline was June 11, 2014.  (Doc. 155, p. 4).  The Court cannot make sense of the ADE's briefing.

[20] Likely Plaintiffs are correct, because "day" means "calendar day" and the ADE has a specific definition of the term "business day."  Ark. Admin. Code § 005.18.10-10.01.

resulting in delays, but reiterates that no small part of these delays came as a result of requests for extensions and other voluntary actions by Plaintiffs' counsel.

### e. Denial of Access to Records

The ADE did not fail to take action to ensure Plaintiff's access to records.  There is a dispute between Plaintiffs and BSD about whether records were improperly withheld by BSD in the first place.  And furthermore, the ADE denies that it failed to take action, by claiming that the Plaintiff did not timely raise this issue.  (Doc. 155, pp. 19-20).  The ADE claims that the Craigs did not raise this issue on the record, and Plaintiffs have not cited to the record where they did so raise the issue.  (*Id.*).  For the Parrishes, it appears that BSD might have delayed turning over records and that the ADE might not have taken every possible step to ensure Plaintiffs's access, however any harm that might have resulted has been redressed by the actions of BSD and Plaintiffs at the November 2014 hearing.  (*Id*.).  For the Craigs, there is no potential denial of access to records.  For both the Parrishes and the Craigs, either the Plaintiffs were not denied access to records, or any such denial did not result in a denial of due process.

### f. Conclusion on All Claims Against the ADE and Commissioner Key.

As described above, the only feasible claims that remain against the ADE and Comissioner Key are the Parrishes and Craigs' alleged procedural due process violations that amount to violations of the IDEA.  For the reasons described in Section E.2 above, all other remaining ADA, § 504, and § 1983 claims against the ADE fail.  Now that the Court has considered the cross motions for summary judgment and reviewed Plaintiffs' allegations of procedural due process violations, the Court concludes that Plaintiffs have been unable to show a material dispute of fact so as to survive summary judgment.  Therefore, summary judgment on all claims against the ADE and Commissioner Key is now proper and will be entered in favor of Defendants.

## IV.   Conclusion

IT IS THEREFORE ORDERED that BSD's motion for summary judgment against the Parrish Plaintiffs (Doc. 136) is GRANTED and the Parrish Plaintiffs' claims against BSD are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that BSD's motion for summary judgment against the Craig Plaintiffs (Doc. 143) is GRANTED and the Craig Plaintiffs' claims against BSD are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that BSD's motion for summary judgment against the Siverly Plaintiffs (Doc. 128) is GRANTED and the Siverly Plaintiffs' claims against BSD are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that BSD's motion for summary judgment against the Laws Plaintiffs (Doc. 132) is GRANTED and the Laws Plaintiffs' claims against BSD are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that ADE's motion for summary judgment (Doc. 125) is GRANTED and the Plaintiffs' motion for summary judgment against the ADE (Doc. 139) is DENIED.  The Plaintiffs' claims against the ADE and Commissioner Key are DISMISSED WITH PREJUDICE.

Judgment will be entered accordingly.

IT IS FURTHER ORDERED that the motion to sever (Doc. 77) is TERMINATED AS MOOT.

IT IS SO ORDERED this 22nd day of March, 2017.

*/s/ P. K. Holmes,* III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE